

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,768

**MARK ANTHONY SOLIZ, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. F45059
### IN THE 413TH DISTRICT COURT
### JOHNSON COUNTY

MEYERS, J., *delivered the opinion of the unanimous Court.*

### O P I N I O N

Appellant was convicted in March 2012 of capital murder, specifically the intentional murder of Nancy Weatherly in the course of committing or attempting to commit burglary or robbery. *See* TEX. PENAL CODE § 19.03(a)(2). Based upon the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. TEX. CODE

CRIM. PROC. art. 37.071 § 2(g).[1]  Direct appeal to this Court is automatic.  Art. 37.071 §

2(h).  Appellant raises eighteen points of error.  We find them to be without merit and

affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

The instant offense was one of numerous offenses that appellant and his

accomplice, Jose Ramos, committed during an eight-day crime spree that ended when

appellant and Ramos were arrested.  Most of these offenses were committed in the Fort

Worth area, but the instant offense took place in Godley, which is in Johnson County.

This offense was discovered when Ramos mentioned it in response to a Fort Worth police

detective's question about another offense that appellant and Ramos had committed.

Appellant's and Ramos's crime spree began with a June 22, 2010 burglary in

which they took several long guns and a Hi-Point 9-millimeter semiautomatic handgun,

among other items.  Later that evening, appellant showed the stolen weapons to a

potential buyer, Ramon Morales.  Morales wanted to buy all five weapons, but appellant

was not willing to part with a rifle and the handgun.  Appellant told Morales that he had

plans for them.  Morales bought the three long guns and pawned them the following day.

On the morning of June 24, 2010, appellant approached a stranger, Justin Morris,

in the parking lot of a shopping mall, pointed a gun at him, and demanded his wallet.

Morris complied, and appellant took Morris's wallet and left.  Appellant was later

---

[1]  Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

videotaped by a convenience-store security camera as he attempted to use Morris's debit card at an ATM.

Later that morning, after witnessing an argument between Luis Luna and a female friend of appellant's, appellant asked his friend if she wanted him to "get [Luna] wet," which was street talk for drawing Luna's blood or killing him. Appellant fired the gun in the direction of Luna's head, but the bullet passed through Luna's ear lobe without seriously injuring him.

That afternoon, appellant and Ramos held Jorge Contreras at gunpoint in a store parking lot while they stole his green Dodge pickup truck. Later the same day, appellant approached Sammy Abu-Lughod in a different store parking lot as Abu-Lughod was getting into his green Dodge Stratus. Appellant pointed a black handgun at Abu-Lughod and demanded his wallet, cell phone, and car. After taking Abu-Lughod's personal items, appellant told him to walk away. Abu-Lughod complied while appellant drove away in the Stratus.

Around 2:00 a.m. on June 28, 2010, appellant and Ramos approached four people who were leaving a bar and demanded their money and wallets. The victims complied. After taking their wallets, appellant and Ramos left in the Stratus.

At 3:30 a.m. on June 29, 2010, Ramos and appellant committed a "drive-by" shooting. Ramos drove the car while appellant fired shots into a house where they thought a rival gang member might be staying. At about 5:00 a.m., appellant and Ramos approached Enrique Samaniego as he was walking to his pickup truck to leave for work.

Either appellant or Ramos shot Samaniego four or five times in the stomach. Samaniego sustained life-threatening injuries, but he survived.

Around 5:30 a.m., appellant and Ramos approached Ruben Martinez, a delivery truck driver who had just completed a beer delivery at a Texaco gas station, as Martinez was walking back to his truck. Appellant pointed the gun at Martinez and demanded his wallet. Martinez complied, offering his cell phone as well. Disappointed that Martinez's wallet contained only ten dollars, appellant shot him in the neck. Martinez later died from complications of this injury.

Less than an hour after shooting Martinez, appellant approached Kenny Dodgin as Dodgin was exiting his car in the parking lot of a Lowe's store. Appellant pointed a gun wrapped in a blue bandanna at Dodgin. Upon seeing appellant, Dodgin locked his car and ran toward the store. He heard three gun shots behind him.

Around 7:00 a.m., appellant burglarized two homes in Benbrook, a town southwest of Fort Worth. Later that morning, appellant and Ramos drove to Weatherly's home and committed the instant offense.

The Fort Worth Police Department's Communications Division received the call when appellant robbed Abu-Lughod of his green Stratus, as well as later calls reporting robberies and shootings involving a green or teal sedan. A 9-1-1 call-taker supervisor informed detectives that the stolen Stratus might be the green or teal sedan involved in the later offenses. Detectives subsequently reviewed offense reports and compared notes. Based on the close physical and temporal proximity of some offenses as well as

similarities in the descriptions of the suspect, weapon, vehicle, and *modus operandi*, they determined that approximately thirteen burglaries, aggravated robberies, and shootings in the Fort Worth area, dating from June 22 to June 29, were likely to be connected. Because of the escalation of violence in the Samaniego and Martinez offenses, all Fort Worth police officers were instructed to be on the lookout for the stolen Stratus.

Around 10:30 p.m. on June 29, officers in an unmarked vehicle established surveillance on the house of a known gang member, Arturo Gonzales, which was near the last known location of the Stratus. Eventually they observed the Stratus leaving Gonzales's house, closely following a Jeep Liberty. The two vehicles appeared to be traveling together. Officers identified the Stratus by its license plate as the vehicle they were searching for and radioed for a marked patrol unit to initiate a stop. With lights and siren activated, a marked unit began following the Stratus. Instead of stopping, however, the Stratus accelerated and passed the Liberty. After a brief pursuit, the Stratus crashed into a parked eighteen-wheeler.

Appellant exited through the passenger side window and ran through parking lots and across a freeway before officers stopped and arrested him. The other occupant of the Stratus, Elizabeth Estrada, exited the Stratus and ran behind the eighteen-wheeler, where officers quickly arrested her. The stolen handgun and the blue bandanna were found inside the Stratus. Meanwhile, police officers stopped the Liberty for an equipment violation and transported its occupants, including Ramos, to the police station for questioning.

Ramos admitted his participation in some of the offenses and provided useful information about them. However, when detectives questioned Ramos about the aggravated robbery in which Contreras's green pickup truck had been stolen, Ramos provided information that was inconsistent with the information detectives had already obtained about that offense. Specifically, Ramos indicated that the offense had ended badly and stated that it did not have to "end that way." This statement puzzled detectives because no one had been hurt and no shots had been fired during the offense. Ramos also referred to a female victim rather than a male victim. After some initial confusion, detectives ascertained that Ramos was describing a previously unknown offense committed in Johnson County. Ramos indicated that a female victim had been shot during a burglary or robbery and her green Toyota Tundra pickup truck had been stolen.

Ramos provided directions to the stolen Tundra, which detectives found parked about a block from Gonzales's house. Detectives checked the truck's registration and obtained the name and address of its owner, Nancy Weatherly. They then contacted the Johnson County Sheriff's Office and drove to Weatherly's house. A sheriff's deputy joined them at the house. They observed that the gate and garage door were open, and the back door of the house was partially open. The interior had been ransacked. Weatherly's body was lying in the kitchen area next to a table and chair. She had been shot once in the back of the head.

The investigation of this offense was ongoing when Fort Worth Detectives William "Danny" Paine and Thomas Boetcher began questioning appellant at the police

station. The interview was recorded. Boetcher advised appellant of his rights and appellant stated that he understood them. When asked if he was willing to talk about the offenses, appellant answered, "All right." Paine and Boetcher initially questioned appellant about the Fort Worth offenses. Later, as they received information about the Johnson County investigation, they questioned appellant about that offense as well.

Paine and Boetcher also obtained two typed and signed statements from appellant that summarized his oral statement. The first typed statement concerned the Fort Worth offenses. In it, appellant admitted his involvement in the Abu-Lughod, Contreras, Morris, Martinez, Dodgin, and bar patron robberies, as well as the Luna shooting. He also acknowledged that Ramos did not participate in all of these offenses.

Appellant's second typed statement concerned the instant offense. In it, appellant admitted that he and Ramos had driven to Godley, where appellant had threatened Weatherly with a gun and had burglarized her house. Appellant denied shooting Weatherly, stating that after he and Ramos had loaded what they wanted into the Tundra, appellant left the gun inside with Ramos and went outside to start the car. He then heard a shot and saw Ramos walking out of the house. With Ramos driving the Tundra and appellant driving the car, they returned to Fort Worth.

After appellant signed the second typed statement, detectives questioned him further. Appellant wavered about whether he or Ramos was the person who shot Weatherly. Eventually, appellant stated that he would confess to the shooting just to "get this over with," and admitted that he shot Weatherly. He also wrote and initialed a

sentence at the end of his second typed statement: "It was me that shot that wom[a]n!!!"

Appellant's statements were not the only evidence that appellant committed the instant offense. Estrada, who was riding in the Stratus with appellant when it crashed, testified that appellant bragged to her about killing an "old lady" in a house in Godley. Appellant told Estrada that he knocked on the door, and when the lady opened it, he pointed the gun at her. The lady backed up, and appellant made her sit down. Appellant told Estrada that he killed one of the lady's horses, which made the lady cry. She begged for her life and prayed. When appellant showed the lady that he was stealing her jewelry box, she asked him not to take it because it had been a gift from her mother, who was now deceased. Appellant then told her to go with her mother and shot her in the head. He demonstrated for Estrada how he held out the gun and fired. He laughed about the incident and ridiculed the lady's "country" accent. He said that later, while taking methamphetamine, he had flashbacks about killing the lady and "seeing her brains go everywhere."

Weatherly's neighbor testified that she passed Weatherly's house around 10:30 a.m. on June 29 and saw a green Stratus parked by the house, facing the road. The next day, when she watched the news, she recognized the car that had been recovered in Fort Worth as the car she had seen at Weatherly's house. Further, a law-enforcement officer testified that, while he was transporting appellant and Ramos from Fort Worth to Johnson County for pretrial proceedings, he overheard appellant telling Ramos that all they needed to do was "play dumb," and authorities would "get" the man who pawned the guns

(presumably a reference to Morales) on capital murder.

Forensic evidence also connected appellant to the instant offense. Jennifer Nollkamper, a forensic scientist with the Fort Worth Police Department crime laboratory, determined that the shell casing recovered from Weatherly's home had been fired through the Hi-Point 9-millimeter semi-automatic handgun recovered from the Stratus. Nollkamper testified that the bullet recovered from Weatherly's home was too damaged for her to state affirmatively that it was fired from the recovered weapon, but she could state affirmatively that it was fired from a Hi-Point 9-millimeter semi-automatic handgun. Lannie Emanuel, a tool mark and firearm examiner for a private forensic laboratory, agreed with Nollkamper's determination that the shell casing had been fired through the recovered weapon. Emanuel, however, did not think that the bullet was too damaged for a positive comparison. He testified affirmatively that the bullet recovered from Weatherly's home was fired from the recovered weapon.

William Walker, a fingerprint examiner with the Tarrant County Medical Examiner, positively identified a latent fingerprint on an audiocassette case in Weatherly's spare bedroom as appellant's fingerprint. A trace analyst from the Tarrant County Medical Examiner's Office identified gunshot residue on appellant's clothing and hands, the interior of the Stratus, and a blue bandanna and towel that were recovered from the Stratus.

## SUFFICIENCY OF THE EVIDENCE

In point of error one, appellant asserts that the evidence at trial was insufficient to

sustain his conviction. He argues that his confession was inadmissible and that, without it, there was no evidence connecting him to the instant offense. However, we consider even inadmissible evidence when reviewing the sufficiency of the evidence. *Neal v. State,* 256 S.W.3d 264, 277 (Tex. Crim. App. 2008). Appellant does not argue that the evidence is insufficient when his confession is considered.

Appellant's confession alone would have been sufficient to prove his guilt of all the elements of capital murder beyond a reasonable doubt. *See Fisher v. State,* 851 S.W.2d 298, 304 (Tex. Crim. App. 1993). Appellant admitted that he threatened Weatherly by pointing a gun at her in her home, and that he took her property and shot her. *See* TEX. PENAL CODE § 19.03(a)(2); *see also Ex parte Thompson,* 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) ("It is both a common-sense inference and an appellate presumption that a person intends the natural consequences of his acts, and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill.") (internal citation omitted).

To the extent that appellant intends to argue that there was no evidence to corroborate his confession, his point of error is multifarious as well as inadequately briefed. *See* TEX. R. APP. P. 38.1; *Cardenas v. State,* 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (stating that an appellate court has no obligation to consider inadequately briefed points of error). Moreover, there was ample corroborating evidence of appellant's guilt, including Estrada's testimony, forensic evidence connecting the gun recovered from the Stratus to the bullet and shell casing recovered from Weatherly's home, and

appellant's fingerprint inside Weatherly's home. *See Cardenas,* 30 S.W.3d at 390 (stating that all that is required for sufficient corroboration of a confession is some independent evidence that renders the commission of the offense more probable than it would be without the evidence). Point of error one is overruled.

In point of error two, appellant asserts that the evidence at trial was insufficient to sustain his death sentence. Specifically, he complains that the evidence was insufficient to support the jury's affirmative finding on the future-dangerousness special issue. Appellant states that the evidence of his future dangerousness was limited to "the facts of the offense, his non-violent criminal record, and a few disciplinary incidents while in custody before trial." He argues that the State failed to present any evidence that he committed aggressive or violent acts "before the days leading up to the crime." Appellant further asserts that his juvenile and adult criminal records did not include adjudications or convictions for violent offenses and that his disciplinary offenses while awaiting trial were not violent.

When reviewing the future-dangerousness special issue, we view the evidence in the light most favorable to the jury's finding and determine whether a rational jury could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. *Martinez v. State,* 327 S.W.3d 727, 730 (Tex. Crim. App. 2010). "Society" in this context includes both the free world and prison society. *See Druery v. State,* 225 S.W.3d 491, 507 (Tex. Crim. App. 2007). The facts of the offense alone may be sufficient to sustain the jury's

finding of future dangerousness. *Martinez,* 327 S.W.3d at 730. Prior adjudicated criminal acts, prior unadjudicated acts of violence against people and property, and habitual drug abuse all constitute evidence of future dangerousness. *Wilkerson v. State,* 881 S.W.2d 321, 326 (Tex. Crim. App. 1994). Gang membership is also evidence of future dangerousness. *See Williams v. State,* 273 S.W.3d 200, 230 (Tex. Crim. App. 2008); *see also Mason v. State,* 905 S.W.2d 570, 577 (Tex. Crim. App. 1995).

Viewed in the light most favorable to the jury's finding, the evidence in this case shows that appellant had a long history of violent conduct that began during his childhood and continued after his arrest and during his trial for the instant offense. At the age of ten, appellant acted as an armed lookout for drug dealers in his apartment complex. When he entered the juvenile-justice system, appellant was committed to the inpatient psychiatric unit of John Peter Smith hospital because of his out-of-control behaviors, which included fighting and carrying guns. Appellant also abused spray paint, cocaine, and alcohol. Appellant's treating psychiatrist at the hospital reported that appellant had antisocial traits: he deflected blame, had difficulty accepting responsibility, and was aggressive, unremorseful, and unempathetic. Appellant's diagnoses at that time included mixed-substance abuse and conduct disorder, not otherwise specified. At trial, the treating psychiatrist acknowledged that, in a person over the age of eighteen, conduct disorder would be diagnosed as antisocial personality disorder, and a person with that diagnosis could be dangerous to others.

Records of the Tarrant County Juvenile Probation Department reflect that, when

appellant was eleven years old, he self-reported his gang affiliation. The records of a group home where appellant resided for approximately two years showed that he destroyed property, assaulted children and staff, and sexually assaulted younger boys. At times, appellant had to be placed in restraints because he posed a danger to himself and others.

When appellant committed the instant offense, he had at least ten prior felony convictions for offenses including theft, burglary, evading arrest in a vehicle, unlawful restraint, and possession of a prohibited weapon. In the weeks before the instant offense, appellant used about $60.00 worth of methamphetamine daily. He had been out of prison for less than a month when he acquired a handgun during a burglary on June 22, 2010. From June 24 to June 29, appellant used the stolen handgun in numerous aggravated robberies and shootings, including the instant offense.

Appellant's violent conduct continued after the instant offense. Estrada testified that shortly before they left Gonzales's house, appellant stated that he needed to obtain more ammunition so that he could kill a girl who had seen him shoot Luna because appellant had heard that she had talked to a detective. After Estrada and appellant left Gonzales's house in the Stratus and appellant saw the police car behind them, he sped up, telling Estrada that he would kill one of the "laws" or die trying. He aimed his handgun at the pursuing police car, but Estrada hit his hand and the gun fell onto the floor of the Stratus just before the crash. While waiting to be questioned at the police station, Estrada overheard appellant calling her a "dumb ass bitch" and reiterating that he would rather

"ride or die," meaning he would rather die fighting than go to jail.

After his arrest, appellant was placed in administrative segregation because of his gang affiliation, and he remained in administrative segregation during the trial. Notwithstanding the heightened security of administrative segregation, appellant's disciplinary offenses while in jail included possessing weapons and contraband and damaging property. On several occasions he flooded his cell, covered his windows, refused to let himself be handcuffed, and refused to follow orders. He once threatened a jail supervisor who would not let him into the general population, saying, "You know who I am. You know what I can do. I will get you." On one occasion he grabbed the hand of a female guard who was handcuffing him in preparation for taking him to a medical examination. He pinched her hand against the door of the food slot and held it there for several seconds, ignoring her orders to stop. He defeated his restraints, once during a doctor's appointment at the jail and another time while he was being returned to his cell from the courthouse. Appellant deliberately bumped into officers while they were escorting him to and from the courthouse. On one occasion, appellant wrestled with an officer who was escorting him from the courthouse until other officers intervened and physically restrained him.

After reviewing the evidence of appellant's future dangerousness that was presented at trial, we conclude that a rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. Point of error two is overruled.

ADMISSIBILITY OF STATEMENTS

In points of error three through six, appellant asserts that the trial court erred when it overruled his motion to suppress his oral and written statements to Fort Worth Police Department detectives because his statements were involuntary. He maintains that admitting his statements to police into evidence violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, his rights under Article I, Sections 3, 10, 13, 15, and 19, of the Texas Constitution, and Articles 38.21, 38.22, and 38.23 of the Texas Code of Criminal Procedure.

The record establishes that at trial, defense counsel offered the audiovisual recording of appellant's oral statement without qualification and for all purposes while cross-examining one of the detectives who interviewed appellant. The prosecutor did not object, and the recording was published to the jury. By offering his oral statement into evidence, appellant waived error concerning the trial court's ruling on his motion to suppress this statement. *See Decker v. State,* 717 S.W.2d 903, 908 (Tex. Crim. App. 1986) (stating that, when appellant offered his confession into evidence before the jury and the trial court admitted it as a defense exhibit, appellant waived his objection to the admission of his confessions); *see also Ex parte Moore,* 395 S.W.3d 152, 157 (Tex. Crim. App. 2013) (stating that when a defendant affirmatively asserts during trial that he has "no objection" to the admission of evidence, he waives any error in its admission despite a pre-trial ruling denying his motion to suppress).

Appellant's written statements were offered by the prosecutor and admitted into evidence after appellant's oral statement had been admitted and published to the jury. These written statements were summaries of the oral statement. Because appellant waived error with respect to

his oral statement, the admission of his written statements does not constitute reversible error. *See Coble v. State,* 330 S.W.3d 253, 282 (Tex. Crim. App. 2010). Points of error three through six are overruled.

## PARTIAL FETAL-ALCOHOL SYNDROME

In points of error seven through ten, appellant asserts that the imposition of the death penalty in his case is unconstitutional because he has permanent brain damage resulting from partial fetal-alcohol syndrome. He notes that a defense expert testified at trial that he had diagnosed appellant with partial fetal-alcohol syndrome and that appellant's cognitive and functional abilities are similar to the abilities of someone suffering from mental retardation, even though appellant is not mentally retarded. Appellant maintains that imposing the death penalty on him constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 13, of the Texas Constitution, and violates his due process rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article I, Sections 10, 13, and 19 of the Texas Constitution. He urges this Court to find that evolving standards of decency prohibit the imposition of the death penalty on a person who suffers from partial fetal-alcohol syndrome to the extent that he is disabled in areas of reasoning, judgment, and impulse control.

Appellant points out that three states have implemented programs to identify and assist juvenile offenders who suffer from fetal-alcohol-spectrum disorders. This development does not demonstrate an emerging national consensus in favor of barring the execution of adult offenders convicted of capital murder who are not mentally retarded but who have permanent brain damage resulting from partial fetal- alcohol syndrome. *See, e.g., Mays v. State,* 318 S.W.3d 368, 379-80

(Tex. Crim. App. 2010); *see also Roper v. Simmons,* 543 U.S. 551, 564-68 (2005); *Atkins v. Virginia,* 536 U.S. 304, 312-16 (2002). At the punishment phase of a death-penalty case, evidence of brain damage resulting from partial fetal-alcohol syndrome is relevant evidence that may be considered by the jury along with other relevant evidence. The weighing of this type of evidence is a subjective determination undertaken by each individual juror. *See Broussard v. State,* 910 S.W.2d 952, 956 (Tex. Crim. App. 1995).

In this case, the jurors weighed appellant's evidence of brain damage and partial fetal-alcohol syndrome along with other relevant evidence and made a normative judgment that the evidence did not warrant a life sentence. This Court will not second-guess the jury's determination. Points of error seven through ten are overruled.

## DEATH-PENALTY SCHEME

In points of error eleven and twelve, appellant asserts that the mitigation special issue set forth in Article 37.071 is vague and indefinite, in violation of his rights under the Fourteenth Amendment of the United States Constitution and Article I, Section 19, of the Texas Constitution. He specifically complains that the trial court did not define the term "mitigating circumstances" in the jury instructions, and therefore the jury was unable to properly consider whether mitigating circumstances should have resulted in a life sentence rather than a death sentence. Appellant acknowledges that we have rejected this complaint before, but he asserts (without elaboration) that the record in this case "clearly rebuts" the presumption that a jury can understand the terms used in the special issues without instruction. We are not persuaded to revisit our previous decisions. *See, e.g., Ladd v. State,* 3 S.W.3d 547, 572 (Tex. Crim. App. 1999). Points of error eleven and twelve are overruled.

In points of error thirteen and fourteen, appellant asserts that the trial court erred in overruling his motion to declare the "10-12 rule" unconstitutional on the ground that it creates an impermissible risk of arbitrary imposition of the death penalty, and in refusing to instruct the jury that if a single juror "holds out" for life, the defendant will receive a sentence of life imprisonment by operation of law. Appellant argues that the jury instructions set forth in Article 37.071, sections 2(d)(2) and 2(g), affirmatively create confusion in the minds of jurors about what will happen if the jury is unable to reach the minimum number of votes required to answer the special issues. He further asserts that Section 2(a) specifically prohibits informing the jury of the result of a failure to agree on the answer to any special issue. Citing *Mills v. Maryland,* 486 U.S. 367 (1988), appellant states that these instructions violate the Eighth Amendment because they lead an individual juror to believe that his vote in favor of a life sentence is meaningless unless a certain number of other jurors are persuaded to vote along with him.

We have previously rejected these claims, and we are not persuaded to reconsider them. *See Williams v. State,* 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *see also Druery,* 225 S.W.3d at 509. Points of error thirteen and fourteen are overruled.

In point of error fifteen, appellant asserts that Article 37.071 is unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence. He argues that Article 37.071 improperly shifts the burden to the defendant to produce sufficient mitigating evidence to warrant a life sentence, negate moral culpability, and outweigh the affirmative finding of future dangerousness. As a result, appellant contends, the death penalty is imposed in a wanton and haphazard manner in violation of the defendant's right to due process, protection from cruel and unusual punishment, and the due-course-of-law provision of the Texas

Constitution.  Appellant acknowledges that we have previously rejected these claims, see, e.g., *Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004), but he argues that this Court should reconsider the matter.  We decline to revisit our previous decisions.  Point of error fifteen is overruled.

In point of error sixteen, appellant cites *Ring v. Arizona,* 536 U.S. 584 (2002), and asserts that the trial court erred in overruling his motion to preclude the imposition of the death penalty on grounds that the indictment failed to contain any allegations regarding the special punishment issues.  He acknowledges that we have previously rejected this claim but argues that we should reconsider the matter.  *See, e.g., Perry v. State,* 158 S.W.3d 438, 447 (Tex. Crim. App. 2004); *Woods v. State,* 152 S.W.3d 105, 120-21 (Tex. Crim. App. 2004).  We are not persuaded.  Point of error sixteen is overruled.

In point of error seventeen, appellant asserts that the trial court erred in overruling his objection to the application of Texas's death-penalty scheme because it has been arbitrarily imposed, in violation of the Eighth and Fourteenth Amendments.  He argues that each county has its own method for determining whether a case should be prosecuted as a death-penalty case, thereby subjecting similarly situated capital defendants to disparate treatment.  Appellant asserts that the failure of the State of Texas to set uniform and specific standards for determining against whom a death sentence will be sought renders the imposition of the death penalty wanton and freakish.  We have previously rejected this claim.  *See Threadgill,* 146 S.W.3d at 671-72.  Appellant has not persuaded us to reconsider it.  Point of error seventeen is overruled.

LETHAL-INJECTION PROTOCOL

In point of error eighteen, appellant asserts that the lethal-injection protocol as it is currently administered in Texas produces unnecessary pain, torture, and lingering death, in violation of the Eighth Amendment.  This claim is not ripe for review.  *See Gonzales v. State,* 353 S.W.3d 826, 837 (Tex. Crim. App. 2011).  Point of error eighteen is overruled.

We affirm the judgment of the trial court.

Delivered: June 18, 2014
Publish