WITHDRAWN 03-23-16



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-76,936

**TERENCE TREMAINE ANDRUS, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL
### FROM CAUSE NO. 09-DCR-051034 IN THE 240TH DISTRICT COURT
### FORT BEND COUNTY

**KEASLER, J., delivered the unanimous opinion of the Court.**

## O P I N I O N

In November 2012, a jury convicted Terence Andrus of capital murder for the October 15, 2008 murders of Avelino Diaz and Kim-Phuong Vu Bui during the same criminal transaction.[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the judge sentenced Andrus to

---

[1] *See* TEX. PENAL CODE § 19.03(a)(7)(A).

death.[2] Direct appeal to this Court is automatic.[3] Andrus raises twelve points of error. After reviewing Andrus's points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

In his sixth and seventh points of error, Andrus challenges the legal sufficiency of the evidence to support his conviction and the jury's affirmative answer to the future-dangerousness special issue, respectively. We address these arguments first. The remaining points of error will be addressed in the order presented.

## STATEMENT OF FACTS

Between 11:00 p.m. and midnight on October 15, 2008, Avelino Diaz and his wife, Patty, stopped to buy milk at the Kroger grocery store at Highway 6 and Bissonnet in Fort Bend County. Avelino dropped Patty off at the store's front entrance and then went to park the car. While Patty was in the store, Ivery Maxey, a Kroger employee, approached her and asked if she was there with anyone. Due to Maxey's facial expression, Patty knew something was wrong and ran to the parking lot. She found her husband lying in a pool of blood on the ground next to their car. He had been shot in the head. The keys were in the ignition, and the engine was on. Avelino's licensed, concealed handgun that he kept in the car was still in its holster and was lying on the ground next to him.

Maxey told police that he was working at the front of the store near the windows when

---

[2] TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

[3] *Id.* art. 37.071, § 3(h).

the shooting occurred. He said that he heard a gunshot, looked up, and saw an African-American male in a trench coat standing next to the left rear side of Diaz's vehicle. He observed the man making a motion as if he were putting something back in his jacket. Maxey ran to tell the store manager what he saw; therefore, he did not see where the suspect went. Maxey, who was familiar with the Diaz family, sought Patty out in the store. The medical examiner testified that Avelino died from a gunshot to the back of the head with the bullet damaging both sides of his brain.

Meanwhile, Kim-Phuong Vu Bui and her husband, Steve, drove into the Kroger parking lot entrance by the side of the building. As they drove through the side parking lot towards the front of the store, Steve heard Kim yell, "He have [sic] a gun." Steve immediately stopped the car. When he looked out his open driver's-side window, he saw an African-American man with a gun. The man was yelling at him and was holding the gun just inches away from Steve's chest. Steve instinctively hit the gas pedal to get away.

As Steve's car began to move, the man immediately began shooting at the car and its occupants. The first shot went through Steve's open window and hit Kim in the head. As Steve sped away, a second shot entered through the back driver's-side passenger window. A third shot, which also went through the back driver's side door, entered at an angle indicating that the shot originated from a farther distance. One of the bullets struck Steve's back, superficially wounding him.

Steve looked over at Kim and saw blood coming out of her mouth. Concerned that

the shooter was still nearby, Steve did not want to wait for help in the parking lot.  So Steve drove Kim to the nearest hospital and carried her inside.  Kim died shortly thereafter.  The medical examiner testified that Kim was shot through the head with a bullet that struck her carotid and vertebral arteries and fractured her jaw, teeth, and first cervical vertebra.

The police obtained surveillance footage from video monitors in the area.  The video taken from a residence at the corner of Bissonnet and Gianna Court—just around the corner from the Kroger—showed a person matching the shooter's description.  The video showed a man walking west toward the Kroger at 11:44 p.m., shortly before the time of the shootings, and then showed the same man walking east 20 seconds after midnight.  The video showed the man walking into the front yard of a home across Gianna Court and disappearing behind a wall for 90 seconds, then walking back onto Bissonnet and continuing east, away from the Kroger.  At 7:15 a.m., the man appeared again on the video but wearing different clothing.  Later the same day, he was recorded returning to the yard, accompanied by a woman.  The police searched the yard, but were unable to find anything.

The police also recovered footage from a camera at the Valero store located about 1/10th of a mile east of the Bissonnet-Gianna Court intersection.  That video recorded a man who appeared to be the suspect entering the store around 11:01 p.m. on the night of the murders.  He was wearing a dark coat and paced back and forth impatiently before leaving.  He then appeared to walk east on Bissonnet toward some apartments.  The video showed the suspect and the woman from the residential video stopping at the Valero the next day.

The police released still images from the Valero footage to the media and Crimestoppers. These images aired on television on October 22nd. Several tips came in that day, and Andrus became a suspect. The police determined that Andrus lived in an apartment at the intersection of Bissonnet and Synott, just east of the Kroger, Valero, and Gianna Court intersection, but they were unable to locate him.

On November 7th, the police learned that Andrus had been arrested in New Orleans on unrelated charges. Fort Bend Sheriff's Detective Jeffrey Martin and Texas Ranger Kip Westmoreland drove to the Orleans Parish Jail to speak with him. After Andrus waived extradition, Detective Martin and Ranger Westmoreland transported him back to Fort Bend County. Andrus confessed to the crime during the car trip back to Texas, although his account of the offense conflicted with the physical evidence.

Andrus stated that he left his apartment on the night of October 15th to find a car and go joy-riding. He said that he was "amped up" on embalming fluid mixed with marijuana, cocaine, and beer. He eventually made his way to the Kroger parking lot.

Andrus stated that he saw a man drop a woman off at the front of the store. Andrus walked over to the car as the man parked the car. Andrus had his gun in his right hand when he opened the passenger door, but then he saw that the car had a stick shift, which he did not know how to drive. Andrus told the man not to get out, but the man did anyway. Andrus asserted that the man had a gun in a holster and reached for it. Andrus said that he shot the man once over the top of the car while the man was facing him. Andrus then ran.

When Andrus was rounding the corner of the Kroger, he saw a car driven by an old man. Andrus claimed that as he approached the car, the driver sped up and tried to hit him. Andrus said that he then fired three shots through the front windshield, but he stated that he did not know if he hit anyone.

Andrus stated that he ran down Bissonnet and ducked into a yard to bury his gun, gloves, and jacket. He then returned to his apartment and told his girlfriend that he had done "something wrong." The next morning, Andrus went back to the yard to look for his gun, but he could not find where he had buried it. He returned later with his girlfriend to look again, but he still could not find it. In his frustration, he threw the shovel he was using into some bushes across the street. Three days later, after seeing his picture on the news, he fled to New Orleans.

After returning to Fort Bend County, Andrus helped the police locate his gun, a .380 automatic, that was buried in the yard, as well as the shovel that he had thrown across the street. Three live rounds were still in the gun's eight-round magazine with one round in the chamber. Investigators recovered four spent bullets from the crime scene that matched the rounds recovered from the gun.

At the punishment phase of the trial, the State presented evidence of Andrus's prior convictions: (1) a May 2004 juvenile adjudication for possession of a controlled substance; (2) a January 2005 juvenile adjudication for criminal solicitation to commit felony aggravated robbery; and (3) a June 2007 conviction in which Andrus pled guilty to

misdemeanor theft. Andrus also admitted that he had been a member of the "59 Bounty Hunter Bloods" street gang. The jury was shown numerous photographs of his gang-related tattoos.

Regarding Andrus's 2005 juvenile adjudication, the State presented the following evidence. On the morning of May 15, 2004, Alison Koenig was driving to her parents' home to pick up some items. She noticed that a car appeared to be following her, so she went the long way to her parents' house. Believing she had lost the car, she stopped her car in front of her parents' home. However, the same car pulled up abruptly and two men got out, one with a gun. The driver told Koenig that she was "going to have to give up [her] fucking purse." The gunman was only two feet away from her. After Koenig gave the driver her purse, he demanded her gym bag as well. He then pushed Koenig up against her car and told her not to turn around. As the driver and gunman left, Koenig got their license plate number. She also noticed a third man in the back seat of the fleeing car. Koenig was able to describe the gunman's clothing—he was wearing a red shirt, black shorts, and a skull cap.

The police located the suspects' vehicle shortly thereafter along with a suspect matching Koenig's description of the gunman. Police brought Koenig to the arrest scene where she identified Andrus, stating that he was wearing the same clothes as the gunman. Some of her belongings were also recovered.

The State also presented evidence of an August 21, 2008 aggravated robbery. Tuan Tran was opening his dry cleaning business at 7:00 a.m. He was setting up the cash register

and had an envelope full of cash when Andrus came in and demanded the money. Tran ran towards the back of the store and Andrus cornered him. Andrus beat and kicked Tran, but it was not until Andrus pulled a knife that Tran was willing to give up the money. Tran threw the money on the floor. Andrus grabbed the money and then emptied all the change from the cash register on his way out. Andrus committed the instant capital murder less than two months later. He was arrested for the aggravated robbery and the capital murder at the same time.

While awaiting trial in this case, Andrus committed numerous infractions in the jails in Harris and Fort Bend Counties. On April 18, 2009, Andrus assaulted another inmate. When a detention officer intervened, Andrus told him, "I don't give a fuck," and "I'm going to get the needle anyway."

On May 9, 2009, Andrus, who was housed on the "super-max" floor of the jail, claimed to be having chest pains. According to jail protocol, detention officers took Andrus to the medical clinic to be checked out. Andrus asked the nurse at the clinic for decongestants, but she told him that she could not provide those due to his other medications. Andrus told her, "Fuck you," and then screamed and yelled obscenities as detention officers tried to calm him down. The officers then escorted Andrus, who was handcuffed and shackled, back to his cell. Andrus refused to walk on his own, so the officers had to physically push him into the elevator to the super-max floor. When they arrived at Andrus's cell, the officers unshackled him. As soon as one officer unlocked the handcuffs, Andrus

turned and punched the officer twice in the face before the officers regained control. That day, officers also discovered in Andrus's cell a broken razor blade and a sharpened, bent key ring. Andrus had apparently cut himself and used his blood to draw a picture of the world on his cell wall and to write "Fuck the world. I want to die."

On May 11, 2009, Andrus jammed open the "panhole" in his cell door, the opening where food, papers, and medicines can be passed to an inmate without the cell door being opened. When an officer went to investigate and looked into the panhole, Andrus threw urine in the officer's face. Andrus then danced around his cell in celebration saying, "I got him, bitch ass, mother fucker. I got his ass." Andrus then taunted the officer, "Come on in and get me. There is nothing you can do to me."

On July 5, 2009, Andrus attempted to pass contraband pills to another inmate. When a detention officer intercepted the pills, Andrus angrily demanded the pills back. Andrus then threatened to throw a cup of urine on the officer. Afterwards, Andrus broke a sprinkler head and flooded his cell. Officers handcuffed Andrus. Andrus threatened one of the officers on duty, saying, "[I'm] going to get him, you just wait and see," and, "Once you take these handcuffs [off of] me, you are going to see how hard I hit." Andrus also told the rest of the staff that he was "going to get all of you." The mental-health unit was called to calm Andrus down.

Two hours later, Andrus began complaining of chest pains. Andrus was taken to the medical clinic where he attempted to convince the attending officer to remove his handcuffs.

When the officer refused due to Andrus's earlier threats, Andrus told him, "I haven't threatened you though." When the officer again refused, Andrus asked him, "Are you scared?" Two officers put Andrus back in his cell. They had Andrus lie down on his bed while they removed his cuffs. Once the cuffs were removed, Andrus jumped up and began kicking and punching the officers, injuring them. Andrus yelled, "I'm going to kill y'all. I told you I'm going to kill y'all." The Special Response Team (SRT) was called. It took five officers to subdue Andrus.

On January 4, 2010, Andrus threw an unknown liquid on an officer as he walked past Andrus's cell. When asked to back up to the cell bars to be handcuffed, Andrus wrapped himself in a blanket so that his arms were inaccessible and the officers had to enter his cell to handcuff him. The SRT was called to handcuff Andrus and move him to a more secure cell. Andrus once again displayed obscenity-laced defiance.

On July 20, 2010, Andrus covered the window of his cell so that officers could not see inside. He refused to remove the cover or to place his hands in the panhole so that he could be handcuffed. The SRT was called. Upon entering Andrus's cell, the officers discovered that Andrus had stopped up the toilet and the shower drain, and used the shower to flood the cell. The cell walls were covered in feces, and 2½ inches of water and feces covered the floor. Andrus was naked, standing by the toilet. Andrus threw liquid on the officers and then resisted their attempts to handcuff him by striking at them.

On July 27, 2011, Andrus stuck his arms through the panhole of his cell door and

refused to remove them. He claimed that he was upset that he was denied recreation even though he had refused his recreation opportunity when it was offered to him. Andrus yelled at the detention officer, "You don't know me, bitch. I'm not some peon inmate. You won't find out. You'd better ask around." He continued to refuse the officer's order to put his arms back inside his cell. The SRT was called and Andrus kicked and struck at the team members who tried to subdue him. He yelled that they did not know him and that he was "going to fuck somebody up." The team moved him to a padded cell where Andrus covered his new cell window with feces.

On July 28, 2011, Andrus told a guard at meal time, "Don't bring that tray over here, bitch. I'm going to throw it and hit somebody with it." As a result of his statements, Andrus was again moved to a padded cell. While being moved, Andrus told the officers, "I have three caps. I have nothing to lose. This will be everyday." Once in the cell, he commented that he "will kill an officer" if given the chance.

Andrus presented evidence that he was raised by a single mother. His father was incarcerated for most of Andrus's life, although Andrus did live with his father during his freshman year of high school until his father was again arrested. Andrus's mother testified that Andrus did well in school and helped take care of his younger siblings. However, he dropped out of school in 10th grade and began getting in trouble with the law.

During Andrus's mitigating presentation, defense expert Dr. John Roache, a pharmacologist specializing in alcohol and drug addiction, testified regarding Andrus's drug

abuse and addiction. He noted that by age 11 Andrus had begun using marijuana. Throughout his teen years, Andrus increasingly used marijuana on a daily basis and periodically used Xanax and alcohol. By age 19, Andrus regularly used PCP and ecstasy and sporadically used cocaine. Dr. Roache testified that drugs impair the development of the adolescent brain in the areas of judgment and impulse control, and that these effects are long lasting. He opined that Andrus's drug use caused him to commit the capital murder. Dr. Roache conceded that Andrus displayed aggressive and hostile antisocial behavior without the drugs, but he maintained that the drugs "unleashed" Andrus's underlying tendencies.

James Martin, a licensed professional counselor with the Fort Bend County Jail, testified that he assisted Andrus with his behavioral issues at the jail. He noted that Andrus had hallucinations and had a poor history of complying with his medication schedule. He testified that although Andrus has antisocial personality disorder, Andrus had been making progress and was beginning to show remorse for the murders. Martin conceded that this progress coincided with the beginning of the instant trial.

Andrus testified in his defense. He told the jury that he had been exposed to drugs as early as 6 years of age because his mother sold them. He noted that he rarely had adult supervision at home, and he started using drugs regularly when he was 15. He stated that he does not like confined spaces and does not like being told what to do. However, he testified that as of August 25, 2012, he had humbled himself and given his life to God. He acknowledged that he previously acted out when he was agitated, but he asserted that he did

not do that anymore. Andrus testified that he believed that he could help other inmates to avoid making the same mistakes he did.

## SUFFICIENCY OF THE EVIDENCE

In point of error six, Andrus claims that the evidence is legally insufficient to support his conviction. When reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt.[4] This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[5]

Andrus specifically contends that, without his confessions, the State's evidence is insufficient to show that he committed the shootings. Because he believes that his confessions were inadmissible, he argues that we should not consider them in our sufficiency review. Andrus does not contend that the evidence is legally insufficient if his confessions are considered.

As a reviewing court, we consider "all evidence in the record of the trial, whether it

---

[4] *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).

[5] *Jackson*, 443 U.S. at 319.

was admissible or inadmissible."[6] Here, the charge authorized the jury to convict Andrus of capital murder if it found that he murdered more than one person during the same criminal transaction.[7] Specifically, the jury could convict Andrus if it found that he intentionally and knowingly caused the death of Avelino Diaz by shooting him with a firearm and then intentionally caused the death of Kim-Phuong Vu Bui by shooting her with a firearm. Here, aside from the confessions, the evidence included eyewitness testimony, video surveillance, and Andrus's flight after committing the crime. Because we consider all of the evidence, including the confessions, Andrus's argument fails. Point of error six is overruled.

In point of error seven, Andrus asserts that the evidence is legally insufficient to support the jury's affirmative answer to the future-dangerousness special issue. He contends that the jury should not have considered Alison Koenig's testimony regarding the 2004 aggravated robbery because she did not identify Andrus as the gunman, but only identified his clothes. He also argues that the murders lacked planning and forethought because his drug use affected his reasoning and decision making. He further points out that James Martin, a Fort Bend County Jail counselor, testified that he could conform his behavior while incarcerated in a drug-free environment.

When reviewing the legal sufficiency of the evidence to support the jury's answer to the future-dangerousness special issue, we view the evidence in the light most favorable to

---

[6] *Soliz v. State,* 432 S.W.3d 895, 900 (Tex. Crim. App. 2014); *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

[7] *See* TEX. PENAL CODE § 19.03(a)(7)(A).

the verdict and determine whether any rational trier of fact could have believed beyond a reasonable doubt there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[8] In its determination of this special issue, the jury is entitled to consider all of the evidence admitted at both the guilt and punishment phases of trial.[9] The jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[10] The circumstances of the offense and the events surrounding it may be sufficient to sustain an affirmative answer to this special issue.[11]

The evidence shows that Andrus exhibited an escalating pattern of violence and disrespect for the law prior to killing Diaz and Bui.[12] The jury also could consider Andrus's uncooperative and violent behavior in jail while awaiting trial. Though Andrus testified that he had "found God" recently and would not act out anymore, the jury was free to disbelieve his self-serving testimony. Because Andrus stipulated that he was convicted of criminal solicitation of aggravated robbery, the jury was free to consider Koenig's testimony

---

[8] *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008). *See also Jackson*, 443 U.S. at 319.

[9] *Young v. State*, 283 S.W.3d 854, 863 (Tex. Crim. App. 2009).

[10] *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

[11] *Devoe v. State*, 354 S.W.3d 457, 462 (Tex. Crim. App. 2011).

[12] *See Jackson v. State*, 33 S.W.3d 828, 838 (Tex. Crim. App. 2000) (stating that an escalating pattern of disrespect for the law supports a finding of future dangerousness).

concerning that incident.  Finally, the jury also could have rationally found that Andrus premeditated these murders as a means of attempting to obtain a car and then acted with calculated intent to escape detection by burying the murder weapon and leaving the state.[13]

Considering the evidence presented at guilt-innocence and punishment, we conclude there was sufficient evidence to support the jury's affirmative finding that there was a probability Andrus would be a continuing threat to society.  Point of error seven is overruled.

**MOTION TO SUPPRESS**

In point of error one, Andrus contends that the judge erred in denying his motion to suppress his confessions in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution.  Andrus claims that detectives ignored his request for counsel following his *Miranda* warnings.  He also asserts that his termination of questioning in Louisiana should have prevented all further questioning.  Therefore, officers should not have spoken to him while he was being transported back to Texas.  Finally, Andrus contends that the six-plus-hour drive back to Texas in a small space—here, the automobile—with the same officers with whom he had just terminated all questioning a few hours before was an impermissible pressure tactic to get him to talk.

We first note that Andrus's appellate brief cites solely Texas cases concerned only with state law.  However, Andrus based his motion to suppress the confessions solely on

---

[13]  *See Barley v. State*, 906 S.W.2d 27, 38 (Tex. Crim. App. 1995) (holding evidence of defendant's calculation and forethought indicative of future dangerousness).

federal law. As Andrus failed to make an objection at trial based upon Texas constitutional law, we limit our review to federal law.[14]

The record shows that law enforcement learned on November 7, 2008, that Andrus had been arrested in New Orleans on unrelated charges and was being held on an outstanding warrant from Harris County relating to the aggravated robbery case. No warrant had been issued yet in the capital murder case. Detective Martin and Ranger Westmoreland drove to the Orleans Parish Jail to interview Andrus. When the officers arrived in the early morning hours of November 8th, they read Andrus his *Miranda* rights, and he waived those rights and spoke to the officers during an audio-recorded interview. Specifically, Andrus stated, "Yeah, I'll talk to you, man, I ain't got nothing to hide." Andrus denied committing any criminal offense, but stated that something might have happened with "someone else he was with." Andrus then stated that he was done talking, and the detectives terminated the interview, saying "Don't worry about it, man. I'm done, dude, now take me back." Andrus did not request an attorney during this interview.

On November 10th, Detective Martin and Ranger Westmoreland learned that Andrus had waived extradition, and they volunteered to transport Andrus back to Harris County on the aggravated-robbery warrant. No warrant had yet issued in the instant case. In preparation for the trip, the officers installed a recording device in their vehicle so they would be able to record anything that happened while they were on the road.

---

[14] TEX. R. APP. P. 33.1(a).

During the drive, Andrus initiated the following conversation:

[Andrus]:   Say, have I been indicted?

RANGER:   For what?

[Andrus]:   Huh?

RANGER:   For what?

[Andrus]:   For anything.  That's why I'm asking.

RANGER:   Yeah, that's why you're wanted.  You've been indicted for
          aggravated robbery.

[Andrus]:   I ain't robbed nobody.

RANGER:   I didn't say you did.  All I said was you've been indicted for it.
          That's what you asked.

* * *

[Andrus]:   I don't got a court date yet?

RANGER:   No.  They got to get you in the system first.

[Andrus]:   An attorney?

RANGER:   Yeah, they'll do that, too.

[Andrus]:   What's an assistant?

RANGER:   In the system.

Andrus then asked if the officers wanted to listen to the radio.  Detective Martin repeated the

*Miranda* warnings, and Andrus again acknowledged that he understood them.

Later, without prompting, Andrus began the following conversation:

[Andrus]:    I got a question.  You said I was indicted on armed robbery, but ya'll said [during the initial jail interview] two people got killed.

RANGER:     It's two separate deals.

[Andrus]:    So, I'm—I'm indicted on armed robbery and two counts of people getting killed?

RANGER:     I don't know if you actually got indicted on armed robbery.  I think they got a warrant for you.  That's what you were wanted for.

[Andrus]:    Well, I'm indicted—

RANGER:     So, they went and got a warrant for armed robbery.  I say they, Houston Police Department.

[Andrus]:    Yeah.

RANGER:     The warrant's out of Harris County, which is where we are going.

[Andrus]:    We aren't going to Fort Bend?

RANGER:     No.  We're going to Harris County.  The—when we said that two people got killed, that was in Fort Bend County.  But there ain't—you ain't been indicted out of Fort Bend County.

Andrus continued to engage the officers in conversation, discussing his thoughts on the aggravated-robbery charge, his preference for the Fort Bend County Jail over the Harris County or Orleans Parish Jails, his juvenile offenses, clubs he liked in the French Quarter, etc.  When Andrus bragged that he would be out of jail within three months, Ranger Westmoreland told him that the "Fort Bend deal ain't going to go away."  Andrus continued to deny any involvement in the killings.

Later, Andrus again asked the officers about the instant case:

[Andrus]:          So, my case in Fort Bend is pending?

DETECTIVE:          It's being investigated now.

[Andrus]:          Wrong place at the wrong time.

DETECTIVE:          What you mean?

[Andrus]:          I was at the wrong place at the wrong time, all over some marijuana.

About four to five hours into the trip, Andrus again brought up the murders and continued to ask probing questions about what evidence the police had obtained. Detective Martin spoke with Andrus about how making a confession and accepting responsibility might help him in a sentencing phase. He explained that if Andrus told his side of the story, the crime might not appear to be "cold-blooded murder." Andrus told him that he was going to get the death penalty anyway and that he would actually ask for it if his other option was 40 years to life. Andrus then stated that he had decided to confess because "I feel like I've got nothing to lose," although he maintained that he killed the victims in self-defense.

Because the officers believed the interview room they needed in Harris County would be closed by the time they reached it, they drove to Fort Bend County. When they arrived at the Fort Bend County Sheriff's Office, Andrus made a videotaped and written statement. Detective Martin and Ranger Westmoreland did not re-read Andrus his *Miranda* rights until approximately three-quarters of the way through the interview because they had forgotten to do so when they changed recording devices from the car to the interview room. When Andrus was read his *Miranda* warnings, he confirmed that he understood each of the rights,

and he agreed to waive them. Andrus also initialed and signed the written warnings on a form. After his written statement was completed, Andrus initialed the written warnings at the beginning of the statement. He also reviewed and corrected the written statement before he signed it. Andrus did not request an attorney or ask to terminate the interview at any time.

At the suppression hearing, Andrus testified that he requested counsel when Detective Martin and Ranger Westmoreland were checking him out of the Orleans Parish Jail. Andrus stated that after they checked out his property, but before they left the building, Ranger Westmoreland pulled him aside and read him his *Miranda* warnings. Andrus testified that he then told Ranger Westmoreland, "I'm going to need that attorney." Ranger Westmoreland, however, testified that he did not read the *Miranda* warnings at that time and that Andrus did not request an attorney. Detective Martin testified that Andrus never requested counsel at that time but only complained about his commissary money. The judge denied Andrus's motion to suppress and filed written findings of fact and conclusions of law.

In reviewing claims alleging *Miranda* violations, we conduct the bifurcated review set out in *Guzman v. State*.[15] We afford almost total deference to the trial judge's rulings on questions of historical fact and on application of law to fact questions that turn upon credibility and demeanor, while we review *de novo* the judge's rulings on application of law

---

[15] 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Pecina v. State*, 361 S.W.3d 68, 78–79 (Tex. Crim. App. 2012).

to fact questions that do not turn upon credibility and demeanor.[16] In deciding whether an accused "actually invoked his right to counsel," appellate courts use an objective standard "to avoid difficulties in proof and to provide guidance to officers conducting interrogations."[17] The accused "must unambiguously request counsel" during a custodial interrogation; that is, "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[18]

### *Request for Counsel*

The record supports the judge's finding that the only time Andrus used the word "counsel" or "attorney" on the drive from the Orleans Parish Jail. But this was not a clear invocation of counsel that required the cessation of questioning; defense counsel conceded as much at the suppression hearing that this "request" was ambiguous.[19] Andrus testified at the hearing that he unambiguously requested counsel as they were leaving the Orleans Parish Jail. Both officers, however, testified that Andrus never made such a request. At a suppression hearing, the judge is the sole finder of fact and is free to believe or disbelieve

---

[16] *Pecina*, 361 S.W.3d at 79.

[17] *Id.* (citing *Davis v. United State*s, 512 U.S. 452, 458–59 (1994)).

[18] *Id.*

[19] *See Davis*, 512 U.S. at 459.

any or all of the testimony presented.[20]  In his findings of facts and conclusion of law, the judge found the officer's testimony credible and Andrus's testimony not credible.  Because Andrus did not invoke counsel, we hold that the judge properly denied this claim in Andrus's motion to suppress.

### Termination of Questioning

Although it is insufficiently developed in his brief, Andrus seems to claim that by saying, "I'm done, dude, now take me back," he invoked his right to remain silent.  We further understand Andrus to claim that this invocation precluded the officers from questioning Andrus on the drive back to Texas.  The judge found that Andrus terminated the officers' questioning by unambiguously invoking his right to remain silent.  However, the judge found that Andrus reinitiated conversation with the officers after the invocation.

"If [an] individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."[21]  The admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his invocation to remain silent was "scrupulously honored."[22]  However, the police may speak with an accused who has previously invoked his right to silence if the

---

[20]  *Ross*, 32 S.W.3d at 855.

[21]  *Miranda*, 384 U.S. at 473–74.

[22]  *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).

accused reinitiates "further communication, exchanges, or conversations with the police."[23]

The record supports a finding that the officers concluded questioning Andrus after he invoked his *Miranda* right to remain silent at the Orleans Parish Jail. The officers did not pose any questions to Andrus on the drive back to Texas. Nevertheless, Andrus gave the officers his confession despite the fact that the officers scrupulously honored his *Miranda* rights. Andrus is the one who re-initiated discussion of his case with the officers on the drive back to Texas. The officers again read Andrus his rights and Andrus expressly stated that he understood them. Even then, the officers did not question Andrus about the details of the offense, but instead, after Andrus repeatedly brought it up, they encouraged him to tell his side of the story because it was the right thing to do. Only then did Andrus confess to the crime. He later gave his written and oral statements at the Fort Bend County Sheriff's Office. We hold that the judge properly denied Andrus's motion to suppress under this alleged *Miranda* violation.

### *Impermissible Pressure Tactic*

We will not reach Andrus's third reason to suppress his confessions: that riding back to Texas with the same officers with whom he had invoked his right to silence was an "impermissible pressure tactic" to get him to confess. Andrus did not make this claim in the trial court and has therefore failed to preserve it for appellate review.[24]

---

[23] *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

[24] Tex. R. App. P. 33.1(a).

The judge properly denied Andrus's motion to suppress his statements. Point of error one is overruled.

## CHALLENGES FOR CAUSE

In point of error two, Andrus asserts that the judge erred by denying his challenge for cause to prospective juror Gordon Freund and by granting the State's challenge to prospective juror Rosa Rodriguez. He argues that the judge denied and granted the respective challenges for cause in violation of the United States Supreme Court's rulings in *Wainwright v. Witt*[25] and *Adams v. Texas*.[26] Although this point of error is multifarious, we will review his arguments in the interest of justice.[27]

### *Prospective Juror Freund*

To establish harm for an erroneous denial of a challenge for cause, an appellant must show on the record that (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of venire member; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury.[28]

---

[25] 469 U.S. 412 (1985).

[26] 448 U.S. 38 (1980).

[27] TEX. R. APP. P. 38.1.

[28] *Comeaux v. State*, 445 S.W.3d 745, 749 (Tex. Crim. App. 2014).

Andrus was entitled to fifteen peremptory challenges.[29] After he exhausted his fifteen peremptory strikes, he requested and received one additional strike. Further, Andrus did not identify any juror who was seated whom he otherwise would have struck but for a lack of peremptory strikes. Therefore, Andrus has not demonstrated any harm from the alleged improper denial of the challenge for cause because any error was ameliorated by the granting of the extra peremptory strike.

### *Prospective Juror Rodriguez*

In a capital case in which it seeks the death penalty, the State may challenge a potential juror for cause on the ground that he has conscientious scruples against the death penalty.[30] A venireperson is also challengeable for cause by either party if the member has a bias or prejudice against the defendant or the law upon which the State or the defendant is entitled to rely.[31] However, a prospective juror who can set aside his beliefs against capital punishment and honestly answer the special issues based on the law and the evidence is not challengeable for cause.[32] A judge may grant a challenge for cause against a prospective juror if bias or prejudice would substantially impair the juror's ability to carry out his oath

---

[29] TEX. CODE CRIM. PROC. art. 35.15(a).

[30] *See id.* art. 35.16(b)(1).

[31] *Id.* art. 35.16(a)(9), (c)(2). *See Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009).

[32] *Hernandez v. State*, 390 S.W.3d 310, 317 (Tex. Crim. App. 2012). *See Witherspoon v. Illinois*, 391 U.S. 510, 522–23 (1980).

and instructions in accordance with the law.[33]

When reviewing a judge's decision to grant or deny a challenge for cause, we look to the entire record to determine whether there is sufficient evidence to support the judge's ruling and reverse only for a clear abuse of discretion.[34] Because the judge is in the best position to evaluate a prospective juror's demeanor and responses, we review a judge's ruling on a challenge for cause with considerable deference.[35] We accord particular deference to a judge's decision when a prospective juror's answers concerning his ability to follow the law are vacillating, equivocating, ambiguous, unclear, or contradictory.[36]

Here, Andrus contends that Rodriguez was qualified to serve because, although her views against the death penalty would affect her, they would not substantially impair her ability to answer the special issues. The record shows that Rodriguez repeatedly stated that her mind was made up that life imprisonment was a harsher sentence than the death penalty and that she would answer the special issues so that the defendant received a life sentence. She also stated that she was against the death penalty for religious reasons and it was "not

---

[33] *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002). *See Witt*, 469 U.S. at 424.

[34] *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010); *Feldman*, 71 S.W.3d at 744.

[35] *Gardner*, 306 S.W.3d at 295; *Burks v. State*, 876 S.W.2d 877, 893 (Tex. Crim. App. 1994).

[36] *Gardner*, 306 S.W.3d at 295; *Smith v. State*, 297 S.W.3d 260, 268 (Tex. Crim. App. 2009).

our place to sentence someone to death." She further explained, "it's not that I wouldn't look at the evidence, it's just honestly it would – my feelings would over – overcome, I guess, the evidence."

When questioned by the defense, Rodriguez said, "I think I could" answer the questions based upon the evidence. When questioned by the judge, Rodriguez stated that in a proper case with the right evidence, she could consider the evidence, but she "wouldn't like it. It would be really hard." On further voir dire by the State, Rodriguez admitted that her beliefs would substantially impair her ability to answer the special issues. Upon final questioning by the judge, Rodriguez agreed that her "feelings against the death penalty are so deep seeded [sic] that [she] would have to go against all of that in order to make a decision based on the evidence[.]"

To the extent that Rodriguez's answers were vacilating, equivocating, unclear, or contradictory, we afford particular deference to the decision of the judge.[37] We also defer to the judge's assessment of Rodriguez's demeanor.[38] The judge did not abuse his discretion in granting the State's challenge for cause. Point of error two is overruled.

## BATSON AND ARTICLE 35.261

In points of error three, four, and five, Andrus alleges that the judge erred in allowing the State to strike prospective jurors Chukwunenye Nweke, Karl Miller, and Kimberly Gentry

---

[37] *Smith*, 297 S.W.3d at 268.

[38] *Davis*, 329 S.W.3d at 807.

in violation of *Batson v. Kentucky*[39] and Texas Code of Criminal Procedure Article 35.261.

Andrus concedes that no *Batson* or Article 35.261 challenges were made at trial. However,

he asserts that he can show a *prima facie* case that these three jurors were struck due to their

race.[40] Therefore, he suggests that this Court should abate his appeal and remand his case

to the trial court to conduct a proper *Batson* hearing addressing the remaining steps of the

*Batson* inquiry.[41] However, without an objection or request for proper relief in the trial court,

Andrus failed to preserve this issue for appellate review.[42] We decline Andrus's invitation

to abate this appeal and remand the case to the trial court to resolve forfeited issue.

Within his appellate argument, Andrus also argues that his counsel was ineffective for

failing to raise any *Batson* or Article 35.261 objections. First, we note that this argument

creates a multifarious claim.[43] Further, Andrus presents no evidence regarding his counsel's

strategic decisions and only speculates that "[t]here is a reasonable probability that the State

---

[39] 476 U.S. 79 (1986).

[40] *See id.* at 97 (holding that once a defendant establishes a *prima facie* case that the State exercised its peremptory challenges in a discriminatory manner, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors).

[41] *See id.*

[42] TEX. R. APP. 33.1.; *Batiste v. State*, 888 S.W.2d 9, 17 n.5 (Tex. Crim. App. 1994) (noting that *Batson* error is not immune from procedural default); *Rosales v. State*, 841 S.W.2d 368, 380 (Tex. Crim. App. 1992) (same); *Mathews v. State*, 768 S.W.2d 731, 733 (Tex. Crim. App. 1989) (holding *Batson* is not immune from procedural default).

[43] TEX. R. APP. P. 38.1.

would not be able to provide race-neutral reasons" for removing the complained-of jurors. We have repeatedly stated that an appellant must bring forward a record that supports his claim of ineffective assistance of counsel.[44] Allegations of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.[45] Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation. Thus, such claims are typically better left to be raised in an application for writ of habeas corpus.[46] We believe these principles apply here. Points of error three, four, and five are overruled.

## EXTRANEOUS ACT EVIDENCE

In his eighth point of error, Andrus contends that the judge abused his discretion by improperly admitting extraneous act evidence in violation of Texas Rule of Evidence 403 during the punishment phase. Specifically, he complains that the judge admitted photos of his gang tattoos that were irrelevant and that improperly inflamed the jury's passions because there was no specific information that he was a gang member. Andrus also complains that the judge erroneously admitted evidence of his participation in the robbery of Alison Koenig.

Andrus did not object to the admission of the tattoo photos. Instead, he stipulated that

---

[44] *Thompson v. State*, 9 S.W.3d 808, 813–14 (Tex. Crim. App. 1999); *Jackson v. State*, 877 S.W.2d 768, 771–72 (Tex. Crim. App. 1994).

[45] *Thompson*, 9 S.W.3d at 813.

[46] *Id*. at 814.

they were true and correct representations of his tattoos and agreed to their admission. He further did not object to Detective Richard White's testimony regarding those photos. We also note that Andrus later testified that he was a member of the "59 Bounty Hunter Bloods" gang. Regarding the robbery of Koenig, Andrus stipulated that he committed the offense and was sentenced to the Texas Youth Commission for three years. Andrus made no objections under Rule 403.

Because Andrus did not object to the complained-of evidence at trial, he has preserved nothing for our review.[47] Point of error eight is overruled.

## CONSTITUTIONALITY OF ARTICLE 37.071

In points of error nine, ten, and eleven, Andrus raises several challenges pertaining to the Texas death penalty scheme. In point of error nine, Andrus asserts that his sentence is unconstitutional because "it was assigned based on Texas' arbitrary system of administering the death penalty." In point of error ten, he argues that his death sentence should be vacated because the instruction required by Texas Code of Criminal Procedure Article 37.071, § 2(f)(4), defining mitigating evidence as "evidence that a juror might regard as reducing the defendant's moral blameworthiness," restricts the evidence that the jury can determine is mitigating. In point of error eleven, Andrus argues that the "10-12 jury instruction" in the Texas capital-murder sentencing scheme violates the Eighth Amendment.

---

[47] TEX. R. APP. P. 33.1(a).

We have previously rejected these issues, and we are not persuaded to reconsider them.[48]

Points of error nine, ten and eleven are overruled.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his twelfth point of error, Andrus contends that his trial counsel were ineffective for failing to adequately investigate and present mitigation evidence. Andrus asserts that no mitigation investigation could have occurred because the mitigation expert withdrew ten months prior to trial and was not replaced. He complains that counsel presented very little mitigating evidence compared to the amount of aggravating evidence presented by the State. He claims that counsel "did not investigate multiple possible mitigating factors and called only two family members, despite knowing that favorable witnesses were available to testify." Andrus does not identify any of these possible witnesses. Andrus generally assails counsel's failure to "construct a persuasive narrative" or "humanize" him.

When confronted with an ineffective assistance of counsel claim from either stage of a capital trial, we apply the two-pronged analysis set forth by the United States Supreme Court in *Strickland v. Washington*.[49] Under *Strickland*, an appellant must first demonstrate that his trial counsel's performance was deficient. Second, he must show that his counsel's

---

[48] *See Threadgill v. State*, 146 S.W.3d 654, 671–72 (Tex. Crim. App. 2004) (finding that Texas death penalty scheme not "arbitrary"); *Coble v. State*, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010) (addressing the mitigating-evidence instruction and the "10-12 rule"); *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005) (addressing the "10-12 rule").

[49] 466 U.S. 668 (1984). *See Hernandez v. State*, 726 S.W.2d 53 (Tex. Crim. App. 1986) (adopting *Strickland* as applicable standard under Texas Constitution).

deficient performance was so serious that it prejudiced his defense, rendering the trial unfair and the verdict suspect.[50] Appellate review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance.[51] The analysis is undertaken in light of the "totality of the representation" rather than by examining isolated acts or omissions of trial counsel.[52] The fact that another attorney may have pursued a different tactic at trial is insufficient to prove a claim of ineffective assistance.[53]

In most circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the strong presumption that counsel's conduct was reasonable and professional.[54] As this Court has previously explained, rarely will the trial record contain sufficient information to permit a reviewing court to fairly evaluate the merits of such a serious allegation: "In the majority of cases, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel."[55] A reviewing court

---

[50] 466 U.S. at 687.

[51] *Scheanette v. State*, 144 S.W.3d 503, 509 (Tex. Crim. App. 2004).

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

could speculate on both sides of an issue, but ineffective assistance claims are not built on retrospective speculation; they must "be firmly founded in the record."[56]

From the information available in the record before us, we can only speculate as to why counsel acted or failed to act as they did.[57] Without more, we must presume that counsel acted pursuant to a reasonable trial strategy. Point of error twelve is overruled.

We affirm the trial court's judgment.

DELIVERED: December 9, 2015

DO NOT PUBLISH

---

[56] *Id.*

[57] *Id.*