Alfonso ATKINSON, Appellant,

v.

The STATE of Texas, Appellee.

NUMBER 13-16-00344-CR

Court of Appeals of Texas,
Corpus Christi-Edinburg.

Delivered and filed March 16, 2017

ATTORNEY OF RECORD FOR THE APPELLANT: Travis W. Berry, Attorney at Law, P. O. Box 6333, Corpus Christi, TX 78466-6333.

ATTORNEYS OF RECORD FOR THE APPELLEE: Edward F. Shaughnessy lll, Attorney at Law, 206 E. Locust Street, San Antonio, TX 78212, Jose L. Aliseda, Bee County District Attorney, 111 S. Mary's St., Suite 203, Beeville, TX 78102.

Before Justices Rodriguez, Contreras, and Longoria

## OPINION

Opinion by Justice Rodriguez

Appellant Alfonso Atkinson appeals his conviction for manslaughter. By one issue, Atkinson argues that there is insufficient evidence to show that he was reckless in causing the death of Calvin Jacob Rathel. We affirm.

### I. BACKGROUND

Shortly after 6:00 P.M. on the evening of January 14, 2015, Rathel appeared at the front door of Deanna Talbot's home in Lagarto, Texas. Talbot's granddaughter Dallas opened the door and found Rathel bleeding, clutching his stomach. According to Talbot's testimony, Rathel told her that he had been stabbed by his friend "Alfonso," Talbot's neighbor. Rathel said that he and Alfonso had been drinking at Alfonso's house when their conversation erupted into an argument. Rathel died ten to fifteen minutes before authorities arrived.

An autopsy was performed by medical examiner Adel Shaker, who determined that the cause of death was a stab wound to the stomach. Shaker also documented cuts on Rathel's fingers, hand, and forearm, which Shaker characterized as "defensive injuries." Shaker testified that given the clean nature of the incisions, the wounds could not have been caused by a mishap such as falling into a pile of jagged iron, as Atkinson suggested at trial, or by any single act with a weapon. Instead, the wounds were of such different direction, location, and depth that they had to be the result of multiple stabs with a knife.

Deputy Joe Guerra of the Live Oak County Sheriff's Office was amongst the first to arrive at the scene. Deputy Guerra testified that he noticed a trail of blood beginning in Talbot's driveway and ending at a house where Atkinson was standing on the front porch. Deputy Guerra also observed gold paint on Atkinson's lips and blood on his pants. He placed Atkinson in the patrol unit.

Chief Deputy Charlie Strumley then arrived, administered *Miranda* warnings, and questioned Atkinson. During an interview which was captured on a dashcam recording, Atkinson varied his account of the day: Atkinson at first stated he had been at home alone all day; he then asserted he was home but denied knowing whether anyone else was present; he next claimed he was not aware of anything happening at the house because he had not been home; he last said his mother had

been home that day, but she left at some point, and no one else was present. When asked about the shiny substance on his lips and red spot on his pants, Atkinson admitted that he had been huffing paint and claimed the spot was from meat he had been cooking. Chief Strumley testified that he believed Atkinson to be intoxicated, given that Atkinson had paint on his lips and smelled of alcohol.

Atkinson then gave consent for a search of the premises. Chief Strumley left Atkinson in the back of the police unit, during which time Atkinson licked his lips clean. When Chief Strumley resumed questioning, Atkinson stated that at approximately 1:00 P.M., he barbequed inside the "shed" in his back yard with his friend Joe Torres who left his house at approximately 2:00 P.M. Atkinson explained that he remained at home after Torres's departure, but left at some point to go "around the block," and that he had only recently returned home.

Atkinson denied knowing anything about the blood found spattered near the fire pit in his shed. However, Atkinson volunteered that his mother had brought a friend he did not know to stay at the family's cabin the previous day. When Chief Strumley showed Rathel's driver's license to Atkinson, Atkinson stated that Rathel looked like his mother's friend, whom he had not seen since the previous day. However, when questioned further about his mother, Atkinson stated that he and Rathel had driven her to the bus station that morning. When asked again about the substance on his lips and the red spot on his pants, Atkinson denied that he had been huffing paint and claimed that the red spot was "paint."

Chief Strumley testified that a camouflage jacket with blood stains was found during the search of Atkinson's house. The blood stains matched Rathel's DNA.

Torres testified that he arrived at Atkinson's house at around 11:00 A.M. that day. According to Torres, Atkinson was wearing a "military-type jacket" and had a hunting knife in a holster on his hip. He stated that a friend of Atkinson's was there, who was introduced to him as "Jake." The three men barbequed, and Torres learned that Jake was "staying with Alfonso in one of the little shacks" near the property. They left Atkinson's house at approximately 2:00 P.M. and drove to Torres's house three miles away, where they planned a construction project. When Atkinson and Jake left Torres's house some time later, Atkinson invited Torres to join them for dinner. Torres returned to Atkinson's house at 7:15 P.M., but arrived to find the street blocked off with police tape.

Randy Aguirre of the Texas Rangers testified that he found a nine-inch knife in Atkinson's front yard. Ranger Aguirre further testified that on the day after Jake Rathel's death, he interviewed Atkinson on video while he was in custody. In the video, Atkinson stated that he met Rathel for the first time on the day of his death. Atkinson stated that he had driven his mother to the bus station with Rathel early that morning, then returned home and dropped Rathel off at the cabin, and he had not seen Rathel since. He then went to a local river, and he was surprised to see police when he returned home.

However, Atkinson later admitted to stabbing Rathel, but claimed he had done so in self-defense: Rathel had gone into the house, taken a .22 rifle from Atkinson's bedroom, and emerged onto the porch, threatening Atkinson. Atkinson swiped at Rathel with a "small" knife to defend himself. He then threw the knife on the back porch, grabbed the rifle, and went inside. Atkinson denied that the nine-inch knife found on his front lawn was the knife he

had used. Atkinson stated that he did not intend to kill Rathel and could not believe that he had died.

In a second video, which was recorded at Atkinson's house, Atkinson is shown taking the officers to the back porch and acting out his account of events. Atkinson asserted that when Rathel emerged with the rifle, Atkinson grabbed a knife from a shelf and "poked" Rathel as he tried to knock the rifle away. Atkinson identified a knife which lay by the porch door as the knife he used. Ranger Aguirre testified that this knife—a "rusty," narrow "steak knife"—was unlikely to have caused the wide incision in Rathel's stomach. In the video, Atkinson stated that he put the rifle on a couch in the living room. However, Ranger Aguirre testified that when officers searched the house, they found no weapons near the couch. Instead, they found a .22 rifle in his mother's bedroom behind a door. When Atkinson was asked why there was no blood on the porch—where Atkinson claimed that the struggle occurred—he responded that he did not know.

Joseph Shelton, an investigator with the sheriff's office, testified that he arranged forensic testing of evidence and documented the trail of blood droplets. Officer Shelton opined that the blood trail began on a metal dolly in the shed and led out to the street, towards Talbot's house, where Rathel died. Regarding the knife found in Atkinson's front yard, Officer Shelton testified that Atkinson did not have a knife in his possession when he was taken into custody that night. An analysis of the .22 rifle revealed no DNA or fingerprints from either Rathel or Atkinson. Finally, Officer Shelton averred that he did not test the steak knife which Atkinson identified on the back porch because "it was obvious that it had not been moved in quite some time."

Atkinson was indicted for first-degree murder. A jury found Atkinson guilty of the lesser included offense of manslaughter and assessed punishment at twenty years' confinement. This appeal followed.

## II. DISCUSSION

By his sole issue, Atkinson argues that the evidence is insufficient to establish the culpable mental state for the offense of manslaughter: recklessness.

### A. Standard of Review

■ In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). We defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id.*

### B. Applicable Law

■ A person commits the offense of manslaughter if he recklessly causes the death of an individual. TEX. PENAL CODE ANN. § 19.04(a) (West, Westlaw through 2015 R.S.). Culpable mental states are classified according to relative degrees, from highest to lowest: (1) intentional; (2) knowing; (3) reckless; and (4) criminal negligence. *Id.* § 6.02(d) (West, Westlaw through 2015 R.S.). Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged. *Id.* § 6.02(e); *Wasylina v. State*, 275 S.W.3d 908, 910 (Tex. Crim. App. 2009); *see Curtis v. State*, 573 S.W.2d 219, 221 (Tex. Crim. App. [Panel Op.] 1978) (affirm-

ing manslaughter conviction because "[t]here was sufficient evidence to show that the greater offense of murder was committed"); *Sullivan v. State*, 646 S.W.2d 679, 680 (Tex. App.—San Antonio 1983, no pet.) (same). Manslaughter is a result-oriented offense: the mental state of recklessness must relate to the results of the defendant's actions. *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013). A person acts recklessly with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. TEX. PENAL CODE ANN. § 6.03(c) (West, Westlaw through 2015 R.S.). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a).

■ Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Culpable mental state may be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). The culpable mental state for a homicide offense may also be inferred from the extent and nature of the wounds inflicted. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (en banc). Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are among the many circumstances which may indicate guilt. *Guevara*, 152 S.W.3d at 50; *see Padilla v. State*, 326 S.W.3d 195, 201–02 (Tex. Crim. App. 2010).

■ In determining whether the culpable mental state for a homicide offense was proven, the jury can use its collective common sense and may apply common knowledge and experience. *See Galvan–Cerna v. State*, 509 S.W.3d 398, 404–05 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Rodriguez v. State*, 90 S.W.3d 340, 355 (Tex. App.—El Paso 2001, pet. ref'd). It is a "common-sense inference" that a person "intends the natural consequences of his acts[.]" *Soliz v. State*, 432 S.W.3d 895, 900 (Tex. Crim. App. 2014). That is, "one's acts are generally reliable circumstantial evidence of one's intent. . . ." *Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009) (editorial marks omitted).

## C. Analysis

■ To begin with, there is ample evidence that Atkinson stabbed Rathel in the stomach, which led to his death in due course. *See Soliz*, 432 S.W.3d at 900. This evidence includes Rathel's dying declaration that Atkinson stabbed him, Atkinson's admission to the stabbing, the autopsy showing that Rathel died of his stab wounds, and forensic evidence showing that Atkinson's clothing and home were covered in blood from Rathel's stab wound. "Because one's acts are generally reliable circumstantial evidence of one's intent," here, the "jury could reasonably infer that [Atkinson] intended to do exactly what he did. . . ." *See Laster*, 275 S.W.3d at 524 (internal quotations omitted); *Lay v. State*, 359 S.W.3d 291, 295 (Tex. App.—Texarkana 2012, no pet.) (same as to murder). Atkinson's use of a knife sheds further light on Atkinson's mental state during the offense. *See Guevara*, 152 S.W.3d at 50; *Moreno v. State*, 755 S.W.2d 866, 869 (Tex. Crim. App. 1988) (en banc) (concluding that threatening another and thrusting a knife was sufficient to show intent to kill).

The extent and nature of Rathel's wounds also provide some evidence of Atkinson's culpable mental state. *See Patrick*, 906 S.W.2d at 487. Among other things, the autopsy revealed that Rathel

suffered injuries to his hands and arms which were consistent with defensive wounds. *See Gutierrez v. State*, 85 S.W.3d 446, 450–51 (Tex. App.—Austin 2002, pet. ref'd) (finding the evidence sufficient to support conviction for murder—and rejection of self-defense theory—in part because the victim had "defensive wounds on his hands"); *see also Escareno v. State*, No. 14-00-00432-CR, 2001 WL 836642, at *3 (Tex. App.—Houston [14th Dist.] July 26, 2001, pet. ref'd) (op. per curiam, not designated for publication) (same); *Cervantes v. State*, No. A14-91-01060-CR, 1992 WL 179532, at *5 (Tex. App.—Houston [14th Dist.] July 30, 1992, no pet.) (op., not designated for publication) (reasoning that the presence of defensive wounds on the victim's hands "aided the State in proving appellant's intent and disproving his self-defense theory").

Similarly, the medical examiner testified that the fatal wound to Rathel's stomach and the defensive wounds on his arms were of such different direction, location, and depth that they had to be the result of multiple stabs with a weapon. In addition to undercutting Atkinson's claim of self-defense, this existence of multiple stab wounds would further justify the rational inference that Atkinson acted as the aggressor in causing Rathel's death and possessed a concomitant mental state. *See Patrick*, 906 S.W.2d at 487; *see also Lardieri v. State*, No. 03-15-00247-CR, 2017 WL 160897, at *5 (Tex. App.—Austin Jan. 13, 2017, no pet.) (mem. op., not designated for publication) (citing *Patrick* and concluding that "multiple stab wounds" helped support "a reasonable inference that appellant intended to commit murder"); *Matos v. State*, No. 01-06-01005-CR, 2008 WL 659832, at *8 (Tex. App.—Houston [1st Dist.] Mar. 13, 2008, pet. ref'd) (mem. op., not designated for publication) (concluding that "multiple stab wounds" and "defensive injuries" helped show that defendant was

not acting in self-defense, but rather had committed murder).

In addition, Atkinson offered several inconsistent statements and implausible explanations in speaking with the police. *See Guevara*, 152 S.W.3d at 50; *see also Overton v. State*, No. 13-07-00735-CR, 2009 WL 3489844, at *22 (Tex. App.—Corpus Christi Oct. 29, 2009, pet. ref'd) (mem. op., not designated for publication) (noting that evidence of "consciousness of guilt," such as making false statements concerning the case, is "perhaps one of the strongest kinds of evidence of guilt"). For one, Atkinson's account of his whereabouts varied greatly during his conversations with police. When first detained, Atkinson told Chief Strumley that he had been home all day on the day of the stabbing. Moments later, Atkinson claimed that he had not been at home, but was at his cabin nearby and had only recently returned. Thirty-five minutes later, Atkinson added that he had driven to the bus station that morning, had returned home, and at some point after Torres departed at 2:00 P.M., Atkinson had left on his own to go "around the block." The following day, Atkinson instead reported that he had gone along with Torres to his house; he later drove to the river and a trailer he owned, and he finally returned home to find police on his street. However, when pressed by investigating officers, Atkinson admitted that he had not gone to a river, but had been at home with Rathel at the time of the stabbing. Similarly, Atkinson's first version of events was that he was in his house when he first noticed the presence of police in the neighborhood. Minutes later, he stated that he first saw the police as he was driving onto his street. Subsequently, he returned to his initial statement that he noticed police from within the house.

For another, Atkinson varied his account of who he had been with on January

and where he saw them. Atkinson first told Chief Strumley that no one else was present at his house that day, but moments later he denied knowing whether anyone else had been present. Atkinson then acknowledged that his mother had been at home at one point, but he repeatedly denied that anyone else was present at the house. Thirty-five minutes later, Atkinson acknowledged that his friend Torres had also been at his house around 1:00 P.M., but no one else was present. Atkinson at first claimed that he did not know where Torres lived, but later acknowledged that he had been at Torres's house that afternoon. Atkinson also stated that he had seen Rathel at the cabin the previous day, but not on the day of the stabbing. Minutes later, Atkinson told Chief Strumley that he had, in fact, seen Rathel on the day of the stabbing when he drove his mother to the bus station, but that he had dropped Rathel off at the cabin and had not seen him since.

The following day, Atkinson reported that after leaving the bus station, he had not dropped Rathel off at the cabin; instead, Rathel returned to the house with him, helped do the cooking, and accompanied Atkinson to Torres's house. Atkinson claimed that after he returned from Torres's house, he dropped Rathel off at the cabin around 3:00 or 3:30 P.M. and had not seen Rathel since. Finally, Atkinson conceded that he saw Rathel after 3:30; he stated that Rathel was at Atkinson's house, on the porch, at the time of his stabbing. However, much of the evidence presented at trial suggested that Rathel was not on the porch when he was stabbed, but was in fact in the shed near the fire pit. Thus, even after all of these variations, Atkinson's final version of events was still inconsistent with critical evidence at trial.

Atkinson also made inconsistent and implausible statements about his relationship with Rathel. Atkinson first feigned ignorance of any victim, and he then identified the victim as a virtual stranger and a friend of his mother's. Next, Atkinson gradually acknowledged having spent more time with Rathel that day, but denied having had any dispute with Rathel. Finally, Atkinson reversed course and claimed that Rathel had emerged from his porch door carrying a .22 rifle, though Atkinson did not identify anything which could have incited Rathel to aggression. However, the abundant evidence at trial permitted the jury to rationally infer a different set of facts: Atkinson and Rathel were good friends; Rathel was staying at the cabin with Atkinson's permission, not his mother's; and the two friends had begun to argue when Atkinson stabbed Rathel.

Atkinson also shifted his explanation of the red stain on his pants. When first questioned, Atkinson claimed the stain was from meat he was barbequing. In a second conversation, Atkinson claimed that it was red paint. Each of these explanations conflicted with the evidence at trial: DNA results showing that the red stain was Rathel's blood.

Atkinson also gave an irregular account of the weapons which were allegedly involved in the stabbing. When Atkinson admitted the stabbing, he asserted that he had done so because Rathel had taken a .22 rifle from Atkinson's bedroom and emerged from the back door of the house, scaring Atkinson. Atkinson claimed that after he wounded and disarmed Rathel, Atkinson put the rifle on the couch in the living room. However, the evidence at trial revealed that the rifle was found behind a door in his mother's bedroom. Forensic testing did not reveal any indication that

either Atkinson or Rathel had touched the rifle.

Similarly, Atkinson maintained that he had stabbed Rathel with a serrated steak knife which he grabbed, in haste, from a shelf on the porch. However, the State offered contrary evidence including photographs, video, and the testimony of three witnesses. This evidence suggested that the steak knife was rusty, was inconsistent with the size and clean nature of Rathel's wounds, and did not have blood on it. Furthermore, the State offered testimony that no blood was found on the porch.

The State also advanced evidence suggesting that the weapon used to inflict Rathel's wounds was actually a sizeable hunting knife. Torres testified that such a knife had been on Atkinson's hip before the stabbing, but investigating officers testified and photographs showed that a similar knife was lying in Atkinson's front yard after the stabbing. The officers testified that this knife was consistent with the size and nature of the incision in Rathel's stomach and also consistent with the forensic evidence that the stabbing occurred near the fire pit, where Atkinson would have had access to the knife by simply reaching to his belt.

Atkinson also gave inconsistent and implausible accounts of his use of inhalants. When Atkinson was first asked about the shiny substance on his lips, he stated that he had been huffing paint on the day of the stabbing. When police again asked about the paint forty minutes later, Atkinson denied having huffed paint that day. However, the evidence at trial included video of Atkinson with a shiny substance on his lips that, when left alone in the patrol unit, he licked off. The State also offered two officers' testimony that Atkinson had gold paint on his lips and appeared to be intoxicated, as well as photographs of a can of gold spray paint by Atkinson's bed.

Finally, there was some direct evidence of Atkinson's mental state at the time of the stabbing. In his January 15 interrogation, Atkinson told Aguirre that he had simply "poked" Rathel in the stomach with a "small" knife, and he did not mean to kill Rathel and could not believe Rathel had died. If believed by the jury, this evidence would favor the inference that Atkinson was reckless in causing Rathel's death. *See, e.g., Lugo v. State*, 667 S.W.2d 144, 149 (Tex. Crim. App. 1984) (en banc) (ordering insertion of a lesser-included manslaughter charge, reasoning that the jury "could have reasonably believed appellant's testimony that he did not intend to kill his wife" along with other evidence suggestive of manslaughter); *Thompson v. State*, 521 S.W.2d 621, 624 (Tex. Crim. App. 1974) (same as to "appellant's testimony that he did not intend to kill the officer").

At the conclusion of the case, the jury reviewed all of the evidence, including Rathel's dying declaration that Atkinson had stabbed him during an argument, Rathel's multiple defensive injuries, Atkinson's many inconsistent and implausible statements, Atkinson's direct testimony concerning his state of mind, and the demeanor of the witnesses. The jury found that this evidence showed that Atkinson consciously disregarded a substantial and unjustifiable risk that his actions with the knife would cause Rathel's death. *See* Tex. Penal Code Ann. § 6.03(c). Viewing the evidence in the light most favorable to the verdict, we conclude that a rational fact finder could have found, beyond a reasonable doubt, the element of recklessness, *see Winfrey*, 393 S.W.3d at 768, especially given that proof of intent or knowledge is sufficient to show the mental state of recklessness. *See* Tex. Penal Code Ann. § 6.02(e); *Wasylina*, 275 S.W.3d at 910; *Curtis*, 573 S.W.2d at 221.

As a subset of his first issue, Atkinson contends that during closing argument, the State rebutted its own case regarding recklessness. In closing, the State urged the jury to find that Atkinson intentionally and knowingly killed Rathel and did not do so with mere recklessness. The State described Atkinson's theory of manslaughter as "absurd" and "ridiculous." Again, proof of a higher degree of culpability than that charged constitutes proof of the culpability charged. TEX. PENAL CODE ANN. § 6.02(e); *Wasylina*, 275 S.W.3d at 910. The intentional and knowing conduct cited by the State was fully sufficient to satisfy the recklessness element of Atkinson's conviction for manslaughter. Atkinson does not otherwise explain how the State's jury argument has any impact on the sufficiency of the evidence—which is Atkinson's lone issue on appeal. We are not persuaded by his argument.

We overrule Atkinson's sole issue.

## III. CONCLUSION

We affirm the judgment of the trial court.