**AFFIRM; and Opinion Filed July 19, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00640-CR

### EDGAR MIGUEL GARCIA, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 1**
**Dallas County, Texas**
**Trial Court Cause No. F-1520811-H**

## MEMORANDUM OPINION

Before Justices Bridges, Lang-Miers, and Evans
Opinion by Justice Lang-Miers

Edgar Miguel Garcia was indicted on a charge of capital murder in the stabbing death of his friend. A jury convicted him of the lesser charge of murder and assessed punishment at twenty years in prison. In two issues, appellant contends the evidence is legally insufficient to support the jury's rejection of his claim of self-defense and is both legally and factually insufficient to support the jury's rejection of his sudden passion claim. For the reasons set out below, we conclude both issues are without merit. We affirm the trial court's judgment.

On September 3, 2015, a Duncanville couple taking an early morning walk discovered the body of nineteen-year-old Spencer Dillon by the side of the road. Dillon had sustained seventeen incise or stab wounds to his neck, shoulder, arm, fingers, thigh, and back. The fatal injury was a gaping wound on the left side of Dillon's neck. The wound was more than six inches long and penetrated almost two inches into the neck, perforating the internal and external

jugular veins. The couple called the police. While the officers were investigating at the scene, a vehicle connected to Dillon was found in an alleyway less than a mile away. The vehicle's interior had "lots of blood," primarily in the back seat, which had multiple slashes.

Officers pieced together the following story after talking to narcotics officers, Dillon's brother, and two of Dillon's friends, Thomas Vela and Antonio Cruz. Dillon was a drug dealer. He and his crew, which included Vela, Cruz, and appellant, hung out at a house on Chinaberry Road in Dallas, where they sold marijuana and did drugs. Appellant was the newest member of the group, and Vela and Cruz did not particularly like him. Vela had seen appellant stealing from a friend's purse, and both Vela and Cruz thought appellant was a thief and untrustworthy, in part because of an incident that occurred a few weeks before Dillon's death.

In that incident, Dillon, a girlfriend, and appellant were stopped in DeSoto on a traffic violation. Dillon was driving. Appellant had cocaine and hid it in the back seat where he was seated. When the police searched the car, they found the drugs. Appellant denied the cocaine was his or knowing about it. As a result, the police arrested Dillon, as the owner and operator of the vehicle, and charged him with cocaine possession. The officers allowed appellant and the female to leave in Dillon's car. Inside the car was Dillon's backpack containing several thousand dollars that went undetected by the police.

Dillon called Vela and Cruz from the jail and asked them to make sure the backpack was still in his car. Vela and Cruz checked, but the backpack was missing and appellant denied taking it. When Vela told Dillon the backpack was not in the car, Dillon was "really upset, like almost crying." That night, Dillon bonded out of jail, and he and Vela went to pick up appellant, who was not aware that Dillon had been released. Vela said Dillon was in the backseat, but believed appellant could see him through the car window and denied there was any "ambush." The group headed to the Chinaberry house. During the three-minute drive, Vela said Dillon kept

–2–

asking appellant about the backpack, if he had seen it, and what happened to it, but appellant "acted like" he did not know. Vela said Dillon was not aggressive in his questioning and did not hit appellant, except to "muff" him or "push" his head. Vela denied that Dillon ever put his cell phone to appellant's head and pretended it was a gun.

Later that night while the three were hanging out at the Chinaberry house, appellant admitted taking the backpack. He returned it to Dillon with all or most of the money. After that night, Dillon continued to hang out with appellant, although Cruz and Vela discouraged it. According to Vela, appellant never seemed afraid of Dillon, but Vela told Dillon he did not like appellant and believed he would steal from him again.

A few weeks later, Dillon and Vela were at the Chinaberry house. Dillon told Vela he was going to pick up appellant to talk to him about the pending cocaine charge. Appellant had given his lawyer an affidavit admitting the cocaine was his, but Dillon heard appellant planned to tell the judge he was coerced into signing the paper. Vela urged Dillon to "leave it alone," but Dillon did not want the charge on his record.

Later that day, Dillon and appellant met up with Vela at the Chinaberry house. At some point, Dillon went to "re-up" his marijuana supply, about two pounds, and Vela and appellant went with him. Before leaving, appellant left his gun and Xanax supply in Vela's car, which was parked outside the Chinaberry house. When the trio returned from the drug buy, they discovered Vela's car had been burglarized. Taken in the burglary were appellant's gun and drugs as well as $300 in cash belonging to Vela. Vela believed Dillon set up the burglary to "get back" at appellant for stealing from him. When Vela took appellant home later that night, appellant was upset and agitated about the burglary and told Vela he "lost a lot of money" and did not know "what he was going to do."

After dropping off appellant, Vela returned to the Chinaberry house to hang out with Dillon and Cruz. A few hours later, appellant texted Dillon and asked if he was busy. Ultimately, appellant agreed to go with Dillon to make a drug transaction. Vela and Cruz both warned Dillon not to get appellant, but Dillon ignored the warnings and left at about 2 a.m. to pick him up. Four hours later, Dillon's body was found just two doors down from the house where appellant lived with his parents.

The police interviewed appellant in connection with Dillon's death. Appellant admitted stabbing Dillon but said he did it in self-defense. Appellant told the officers that Dillon attacked him in the car while dropping him off. He said Dillon thought appellant was "snitching" on him and began "punching" him. Appellant had a knife in his sock. While struggling with Dillon, he grabbed the knife to protect himself, jabbed Dillon multiple times in the chest area, and then pushed him, knocking Dillon into the backseat. Appellant said he also ended up in the backseat, and the struggle over the knife continued. After several minutes, he said Dillon appeared tired and got out of the car.

Appellant, who was covered in blood, panicked and drove off in Dillon's car. Appellant said he took off his shirt and shorts and threw them out of the window while driving and tried to wipe away the blood with a blanket that was in the car. He also told the police that he dumped evidence, including the blanket, knife, and cell phones, at the Chinaberry house. Afterwards, he abandoned the car in an alley near his home.

Appellant walked home and took a shower. Then he went back to where Dillon's body was located and took Dillon's backpack containing marijuana and money. He put the marijuana in a truck in the backyard of his home and the money in his wallet. At some point, appellant called 9-1-1 to make it look like an unknown person had robbed Dillon. A few hours later, he went to work.

–4–

During the interview, the detectives commented on appellant's injuries: a "pretty deep" cut to the thumb but not deep enough to require "a stitch," a bite mark on appellant's right forearm, a small abrasion to his forehead, and minor cuts or scratches to his shoulder and hands. Photographs of appellant's injuries were admitted into evidence.

When asked when the deep slash across Dillon's throat occurred during the struggle, appellant said he did not remember. Later, he indicated it may have happened when he first stabbed Dillon. But he denied ever making a slashing motion. He never told the police that he was afraid of Dillon, that Dillon tried to kill him, that Dillon held a gun on him that night or any other night, or that he ever saw Dillon with a weapon.

Dr. Grant Herndon performed the autopsy, which showed seventeen sharp force injuries to Dillon's neck, right shoulder, right arm, right thigh, back, and both hands. In addition, there were several abrasions and contusions to the scalp, back, right thigh, knee, and left lower leg. Herndon determined that Dillon died as a result of the large incised wound to his neck that cut through several muscles as well as the internal and external jugular veins. According to Herndon, Dillon would have lost consciousness within "a matter of seconds" of receiving this injury, unless he was able to immediately apply pressure, in which case Dillon could have maintained consciousness for "maybe a few minutes."

Appellant testified in his defense. He said he started selling drugs when he began running around with Dillon. He said Dillon "fronted" him marijuana and Xanax pills, and he would sell them and make a profit for himself and Dillon. He admitted that Dillon was arrested for drugs that were actually his. But, he denied taking Dillon's backpack and money while Dillon was in jail. He said Vela called him about bonding Dillon out of jail. Vela picked him up and when he got in the front passenger seat, Dillon "popped up" from the back seat, put a gun to his head, and asked about the missing money. According to appellant, Dillon told him not to

turn around and threatened to find a "dark street" so he could shoot him. Although appellant initially denied taking the money, he eventually admitted taking it because he was being threatened. Over the next few days, he said he gave Dillon about $700 in repayment but still owed him money at the time of Dillon's death.

Appellant testified that a few weeks later, on the night of Dillon's death, he went with Dillon and Vela to buy marijuana. He denied, however, that he had a gun that night or that he put a gun and drugs in Vela's car for safekeeping. After he went home, he and Dillon exchanged text messages and he agreed to go with him to make a drug deal. Appellant said he put a knife in his sock for protection.

While Dillon met with the drug buyer, appellant remained hidden in the backseat of Dillon's car. Once the buyer left, appellant got in the front seat, and he and Dillon sat in the car smoking marijuana, using cocaine, and talking. During this time, Dillon asked appellant if he planned "to snitch" on him and appellant said no. After about two hours, they headed back to appellant's house. As Dillon pulled up to the corner, he started asking appellant again about "snitching" and then asked if he had anything to do with Vela's car being burglarized. According to appellant, Dillon got aggressive, yelled at him, and called him a snitch.

Dillon started punching appellant, pinned him against the passenger door, and banged his head against the window. According to appellant, Dillon demanded appellant's money and threatened to "fuck" him up and warned that snitches "didn't make it in this world." Appellant feared Dillon was going to take him back to the Chinaberry house and call his friends. Appellant said he grabbed the knife from his sock, while holding Dillon off with his forearms, and "jabbed" Dillon a few times to get Dillon off of him. Appellant said Dillon "turn[ed] around and [went] in the back seat." Once there, he said Dillon grabbed his arm to take the knife from him, and appellant said he ended up in the back seat on top of Dillon. The two struggled over control of

–6–

the knife for about four or five minutes. At some point, appellant said he "fell into" Dillon, and Dillon let go of the knife. Appellant said he got off of Dillon and moved to the other side of the car. Although he denied he slashed Dillon's throat, appellant said he noticed "more blood" after that. Dillon said "something" about going to appellant's house, grabbed the backpack, and got out of the car. Appellant locked the doors and drove off. He knew Dillon was "hurt pretty bad" because there "was a lot of blood," but he did not know how badly. He did not call the police because he said he did not know what to do. Rather, he panicked and drove to the Chinaberry house, where he threw "stuff" out of the car. Then he abandoned the car in an alley near his house.

Appellant walked home and took a shower. He also called 9-1-1 and made a report to make it seem like Dillon had been robbed and killed by someone else. He said he lied because he was afraid Dillon's friends would "come after" him. After calling 9-1-1, he went outside where Dillon was lying. He said Dillon was not moving and did not appear to be breathing. He grabbed Dillon's backpack and put the marijuana in a truck in his backyard. He denied taking any of Dillon's money, although there was blood on money in appellant's wallet when he was arrested.

On cross-examination, appellant acknowledged that he did not tell the police Dillon threatened him with a gun, demanded money, or accused him of being responsible for the burglary of Vela's car. He also conceded he was not afraid of Dillon, even after he claimed Dillon held a gun to the back of his head while questioning him about the backpack. Appellant also admitted that the Xanax pills, which were his source of income, and his gun were taken just hours before the fight with Dillon. But he denied he took a knife to his meeting with Dillon because he planned to steal Dillon's marijuana and money.

When asked why he did not exit the car when Dillon went into the backseat, appellant said he did not know what to do. He also admitted that Dillon jumped into the backseat to get away from the knife. When the prosecutor reminded him that Dillon had been stabbed in his back, the back of his arm, and over his entire body, appellant explained they were "just struggling over the knife." He also admitted that Dillon never got full control of the knife. In closing argument, the prosecutor sought a capital murder conviction for murder in the course of robbery. The jury, however, found appellant guilty of murder.

In his first issue, appellant challenges the sufficiency of the evidence to support the jury's rejection of his self-defense claim.

As charged here, a person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. *Id*. § 9.31(a). A person is justified in using deadly force against another (1) if he would be justified in using force against another under section 9.31 and (2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *Id*. § 9.32(a). "Deadly force" means "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id*. § 9.01(3).

The defendant has the initial burden of producing evidence to raise self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). If the defendant produces some evidence, the State has the burden of persuasion to disprove the raised defense. *Zuliani,* 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 914. The State is not obligated to offer evidence refuting a claim of self-defense; rather, the State is

required to prove its case beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14. The issue of self-defense is a fact issue to be determined by the jury. *Saxton*, 804 S.W.2d at 913. Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence. *Id*. at 914. When a fact finder determines the defendant is guilty, there is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594.

When an appellant challenges the sufficiency of the evidence to support the rejection of a self-defense claim, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914. Our duty is to ensure the evidence the State presented supports the jury's verdict and the State presented a legally sufficient case of the offense charged. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).

Appellant argues the evidence demonstrated he was legally justified in using deadly force against Dillon. Relying on his version of events, appellant claims he pulled out his knife to defend himself after Dillon attacked him in the car. He said he had been previously assaulted by Dillon and reasonably believed his life was in danger when appellant told him snitches "do not make it in this world." Finally, he contends he sustained injuries "consistent with someone struggling over a knife" and was "cooperative and open" with detectives when they questioned him.

But other evidence at trial refuted appellant's claim that Dillon previously attacked him over the missing money, and Cruz, Vela, and a third person, who was appellant's friend, testified appellant never appeared fearful of Dillon. Rather, appellant and Dillon continued to spend time together even after the disagreement about the missing backpack. In fact, appellant admitted that after Dillon allegedly threatened him with a gun to his head, he went to the Chinaberry house and smoked marijuana with Dillon and was not afraid. Evidence showed that Dillon never carried any weapon, but appellant carried guns and a knife.

As for the physical evidence, the jury could assess appellant's injuries from photographs taken at the time. Those photographs showed minor cuts to his hand, some scratches, a bite mark on his arm, but no bruises or other injuries that would be consistent with his story that Dillon was beating him when he pulled out the knife. In contrast, Dillon had stab or incise wounds all over his body, including the fatal wound to his neck. That injury was several inches long and deep enough to cut through the muscle and internal and external jugular veins. Despite the magnitude of the wound, appellant claimed he did not know when or how it happened, only suggesting that it might have occurred when he fell on top of Dillon. Dillon also had stab wounds to his back and the back of his arms. Given the wounds and their locations over Dillon's body as well as all the blood and slash marks to the backseat of the car, the jury could have believed that appellant attacked Dillon with the knife, that Dillon tried to get away by jumping to the backseat, and appellant followed and continued to stab him.

Additionally, appellant's story at trial differed from his interview with the police hours after Dillon was found. Appellant never told the police that he was afraid of Dillon, that Dillon tried to kill him, that Dillon threatened him with a gun, or that he saw Dillon with a gun. He did not tell them Dillon demanded money or banged his head against the window and, when asked, said he did not know how he got the bite mark on his forearm.

–10–

Finally, even if Dillon assaulted and threatened appellant, a jury could have believed Dillon's use of deadly force was not reasonable. There was no evidence that Dillon had a weapon that day, and any evidence that he had a gun on a prior occasion was disputed. Dillon suffered seventeen stab or incise wounds while appellant suffered only minor injuries. In fact, appellant was able to walk home, shower, take a nap, and go to work as usual.

Considering all the evidence in a light most favorable to the verdict, and given the jury's role in resolving conflicts in the evidence, we conclude the jury could have rationally rejected appellant's claim of self-defense. *See Atkinson v. State*, 517 S.W.3d 902, 907 (Tex. App.—Corpus Christi 2017, no pet.) (concluding existence of multiple stab wounds undercut defendant's claim of self-defense and justified rational inference that defendant was aggressor when analyzing evidence of culpable mental state in manslaughter case); *Aguilar-Motino v. State*, No. 01-08-00527-CR, 2009 WL 3321418, at *3 (Tex. App.—Houston [1st Dist.] Oct. 15, 2009, pet. ref'd) (mem. op., not designated for publication) (concluding lack of physical evidence to support claim of self-defense, multiple stab wounds to victim, and defendant's behavior in fleeing scene after disposing of weapon and failing to report attack sufficient for jury to reject self-defense claim); *Matos v. State*, No. 01-06-01005-CR, 2008 WL 659832, at *8 (Tex. App.—Houston [1st Dist.] Mar. 13, 2008, pet. ref'd) (mem. op., not designated for publication) (concluding that "multiple stab wounds" and "defensive injuries" helped show defendant was not acting in self-defense but had committed murder). We overrule the first issue.

In his second issue, appellant argues the evidence is both legally and factually insufficient to support the jury's rejection of his claim of sudden passion.

At the punishment phase, appellant testified he was not expecting Dillon to attack him that night. He said he grabbed the knife because he was afraid Dillon would call his friends and they would "get" him over at the Chinaberry house. He said they had beat him up once before

and put a gun to the back of his head. He also said he never knew where he cut Dillon until the detectives showed him the photograph during his interview. The jury rejected Dillon's claim of sudden passion and sentenced him to twenty years in prison.

Once a defendant has been found guilty of murder, he may raise, at the punishment phase, the issue of whether he caused the death under the immediate influence of sudden passion arising from adequate cause. TEX. PENAL CODE ANN. § 19.02(d). If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is reduced to a second-degree felony. *Id*. A person acts with "sudden passion" if the passion is directly caused by and arose out of the provocation of the individual killed or another acting with the person killed, and the passion arises at the time of the offense and is not solely the result of former provocation. *Id*. § 19.02(a)(2). An "adequate cause" is one which would "commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id*. § 19.02(a)(1).

Although the issue of sudden passion is a punishment issue, it is analogous to an affirmative defense because the defendant has the burden of proof by a preponderance of the evidence. *See Matlock v. State*, 392 S.W.3d 662, 667 & n.14 (Tex. Crim. App. 2013); *Gaona v. State*, 498 S.W.3d 706, 710 (Tex. App.—Dallas 2016, pet. ref'd). For this reason, a finding on sudden passion may be evaluated for legal and factual sufficiency. *Gaona*, 498 S.W.3d at 710.

When reviewing a legal sufficiency challenge to a negative finding on sudden passion, the standard of review is the same as the legal sufficiency standard utilized in civil cases. *Id*. First, we review the record for a scintilla of evidence to support the jury's negative finding on sudden passion and disregard all evidence to the contrary unless a reasonable fact finder could not. *See id*. If we find no evidence that supports the finding, we determine whether the contrary

proposition was established as a matter of law. *Id*. We defer to the fact finder's determination of credibility of the testimony and weight to give the evidence. *Id.*

In a factual sufficiency review, we view the entire record in a neutral light, and we may not usurp the function of the factfinder by substituting our judgment in place of the factfinder's assessment of the weight and credibility of the witnesses' testimony. *Matlock*, 392 S.W.3d at 671. The standard of review is whether after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See id.*

Here, appellant argues the attack in the car happened unexpectedly and did not allow for "cool reflection." He argues the evidence showed he was "sufficiently provoked" in a way that forced him to immediately "defend his own life."

Applying the appropriate standards and having reviewed the entire record as set out above, we conclude the jury could have disbelieved appellant's version of what happened, could have determined Dillon did not threaten or assault appellant prior to having his throat fatally slashed, and thus could have concluded there was no provocation by Dillon. Consequently, we conclude that the evidence is legally and factually sufficient to support the jury's rejection of appellant's claim of sudden passion. We overrule the second issue.

We affirm the trial court's judgment.


/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

160640F.U05

–13–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

EDGAR MIGUEL GARCIA, Appellant

No. 05-16-00640-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 1, Dallas County, Texas
Trial Court Cause No. F-1520811-H.
Opinion delivered by Justice Lang-Miers;
Justices Bridges and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 19th day of July, 2017.