

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00217-CR

_____


TAKYME JAMES, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the 5th District Court
Bowie County, Texas
Trial Court No. 17F1231-005


Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

## MEMORANDUM OPINION

Following a jury trial, Takyme James was convicted of murder and sentenced to life imprisonment. On appeal, James claims that the evidence that he intended to cause serious bodily injury to the victim is insufficient to sustain his conviction. Because we find the evidence legally sufficient to sustain the conviction, we affirm the trial court's judgment.

## I.      Standard of Review

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict

the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

## II.    Analysis

The State's indictment charged that James committed "an act clearly dangerous to human life" that caused Sanders' death by shooting him with a firearm "with the intent to cause serious bodily injury." "A person commits an offense if he . . . intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(2). On appeal, James challenges only whether he intended[1] to cause serious bodily injury[2] to Sanders.

"Proof of a culpable mental state is often made by circumstantial evidence." *Rhymes v. State*, 536 S.W.3d 85, 95 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Louis v. State*, 329 S.W.3d 260, 268 (Tex. App.—Texarkana 2010), *aff'd*, 393 S.W.3d 246 (Tex. Crim. App. 2012). "Intent may . . . be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (citing *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995)). Intent may also be inferred from the extent of the victim's injuries, the manner in which the offense was committed, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). "In homicide prosecutions, although the intent to kill may not be presumed, 'the jury may . . . infer

---

[1]"A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a).

[2]"'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46) (Supp.).

intent from any facts in evidence which it determines proves the existence of [an] intent to kill, such as the use of a deadly weapon.'" *Rhymes*, 536 S.W.3d at 95 (quoting *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003)). In considering these circumstances, the jury is entitled to rely on its collective common sense "and may apply common knowledge and experience." *Atkinson v. State*, 517 S.W.3d 902, 906 (Tex. App.—Corpus Christi 2017, no pet.). It is "a common-sense inference . . . that a person intends the natural consequences of his acts." *Soliz v. State*, 432 S.W.3d 895, 900 (Tex. Crim. App. 2014) (quoting *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005)); *see Laster v. State*, 275 S.W.3d 512, 514 (Tex. Crim. App. 2009) (actions are "generally reliable circumstantial evidence" of intent).

The evidence at trial showed that on the evening of December 3, 2017, James and Sanders engaged in a fist fight following a dispute while at a football-watching party. Sanders evidently got the upper hand in the fight, as evidenced by James' bloody, bruised, and swollen face. After the fight, James left the party and went to see his friend, LaPrense Willis. James, Willis, and Willis' brother, Clarence, then drove Willis' car to Sanders' house, where James and Clarence got out of the car. When Sanders and his wife, Dorsanner Butler, saw the car pass in front of their house, they went inside the house and locked the doors. The evidence showed that James, who gained entry into the house after the dead-bolted front door was kicked off of its hinges, killed Sanders with a single shot fired from a .380 semi-automatic handgun. Sanders was found lying on his stomach underneath a table, bleeding profusely from a gunshot wound to the pelvic area. He was taken by ambulance to the hospital, where he later died.

4

The bullet that struck Sanders passed through a wall located to the right of the front door. A single .380 shell casing was found on the couch, located against a wall on the right side of the front door. According to measurements made at the scene, the bullet entered the wall at a height of three feet and three inches from the floor and exited the wall at a height of three feet and three-quarters of an inch from the floor. Based on this information, crime scene investigator Marc Sillivan testified that the bullet passed through the wall at a slight downward angle, which was approximately hip-high on Sanders, who was on the other side of the wall when he was struck by the bullet.

Sillivan further explained that a shell casing from a semi-automatic firearm is extracted up and to the right.[3] Based on the location of the bullet hole in the wall, its trajectory, and the location of the shell casing, Sillivan concluded that the shooter was standing in the living room next to the couch facing the kitchen when he fired the gun. Given the pressure required to pull the trigger on a .380 semi-automatic handgun,[4] Sillivan testified that this was not a situation in which the gun accidentally fired.

When James was arrested the following day for Sanders' murder, he told officers that he was waiting for them and stated, "All the stuff y'all looking for me for, I did." James also told the arresting officer that he did not mean to shoot Sanders, that he had just wanted to scare him, and that he never "wanted that man to die that way." James also told the arresting officers that they would never find the gun. When he was interrogated, James admitted that he shot Sanders.

_____

[3]The weapon in this case was not located.

[4]According to Sillivan, who was qualified as an expert witness, it takes anywhere from two to seven pounds of pressure to pull the trigger on a .380 semi-automatic weapon.

James argues that the evidence is legally insufficient to prove that he intended to cause serious bodily injury because, although shooting a firearm in the direction of another can be an act clearly dangerous to human life, *see Forest v. State*, 989 S.W.2d 365, 368 (Tex. Crim. App. 1999), shooting someone does not always result in serious bodily injury, *see Williams v. State*, 696 S.W.2d 896, 898 (Tex. Crim. App. 1985) (gunshot wound, although caused by deadly weapon, is not per se serious bodily injury). And, James maintains, the State did not prove that he intended to cause Sanders serious bodily injury. In support of this claim, James attempts to discredit Sillivan's testimony that Sanders was tracked:

> Q        Okay. And I think you told me, Officer, that your opinion was, based upon a shot like that, that there was tracking, that that person was tracked. Tell the jury about that.
>
> A        If a person's standing here, that -- the victim could have either been in this area once the door's kicked, running to this area or coming from a bedroom going to this area, but our victim was behind this wall at the time of the shot.
>
> . . . .
>
> Q        Okay. And then I think, if you'll -- I think here at -- this is going to be the -- what you're talking about as the single shot in the house?
>
> A        Into the wall, yes, it is.
>
> Q        Okay. So based upon the position of Mr. Sanders' body, is it your opinion that he was running into another part of the house?
>
> A        Yes. I believe he was coming into this area here, running into this room here. Once he runs, gets by the wall, the bullet travels through the wall and then hits him in the hip.

James contrasts this testimony with forensic evidence regarding the location of the gunshot wound. Dr. Stephen Lenfest, a medical examiner at the Dallas County Medical Examiner's Office, testified

that Sanders received a gunshot wound to the upper right thigh or the top of the right leg. The bullet had perforated and split in the right femoral artery and vein in the upper leg. According to the autopsy report, the "direction of the projectile is front to back, right to left, and slightly downward."[5]

Based on this evidence, James argues that it was not possible for Sanders to have been running away from James when Sanders was shot. Instead, he contends, Sanders would have had to have been standing in the kitchen facing the living room behind the wall and out of James' sight when he was shot. Consequently, James concludes, he could not have been tracking Sanders' movements when he fired the gun. James concludes that absent the viability of the "tracking" testimony, there was no evidence before the jury that James intended to cause serious bodily injury to Sanders, or that he was even aware that Sanders was in the kitchen at the time he fired the gun.[6] We disagree.

Regardless of James' characterization of the "tracking" testimony, the jury—as the sole judge of the weight and credibility of the evidence—was entitled to rely on this evidence if it chose to do so. *See Brooks*, 323 S.W.3d at 899. And, in this case, the entirety of the evidence is sufficient to permit a reasonable jury to infer that James intended to cause serious bodily injury to Sanders.

Butler testified that they left the party following the altercation between Sanders and James. When they arrived home, Butler called her father to let him know that she and Sanders were on

---

[5]Lenfest testified that the description of the path of the bullet in the autopsy report "doesn't mean anything about the position of the decedent or the suspect but as -- after the bullet entered the body, it went from his front towards the back, from the right to the left and slightly downward."

[6]James' argument invites this Court to engage in a factual sufficiency analysis, which we decline to do. *See Brooks*, 323 S.W.3d at 895.

7

their way to pick up their four-year-old daughter from his house. As Butler and Sanders walked outside, Butler saw Willis' car come down the street, make the block, and then pull up next to their house. Clarence and James got out of the car as Butler and Sanders walked back to the front door to go inside. Butler testified that James was angry and was carrying a gun as he approached them. James told Sanders, "No, don't run in the house now, n-----. Don't get scared now, n-----. Don't go nowhere now, n-----." Once inside, Sanders told Butler to go hide in the bedroom and call 9-1-1. Butler testified that Sanders told her to hide so that she would be safe if they "did come in shooting." While Butler was hidden in the bedroom, James forcibly entered Sanders' house with a loaded .380 handgun and shot through the wall in the precise spot where Sanders stood. Butler heard the gunshot and then heard stumbling over the front door which had been kicked in. She exited the bedroom to find Sanders lying on the den floor bleeding and unresponsive. The entire course of events, from the time Clarence and James walked into the yard until Butler discovered Sanders had been shot, was less than one minute. James did not remain at the scene and render aide. Instead, he fled the scene and discarded the gun. He was arrested at his home the following day, at which time he confessed to shooting Sanders.

Based on James' statements and behavior, the circumstantial evidence, and the location and nature of Sanders' wound, a reasonable jury could infer that James intended to kill or cause seriously bodily injury to Sanders. *See Guevara*, 152 S.W.3d at 50; *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). The jury could also infer intent from James' use of a deadly weapon. *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986) (stating that "[i]f a deadly weapon

is used in [a] deadly manner, the inference is almost conclusive that [the appellant] intended to kill") (quoting *Hatton v. State*, 21 S.W. 679 (Tex. Crim. App. 1893)).

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that legally sufficient evidence supported the jury's finding of guilt.

## III.    Conclusion

We affirm the trial court's judgment.

Ralph K. Burgess
Justice

Date Submitted:      September 4, 2019
Date Decided:        September 19, 2019

Do Not Publish

9